FILED
COURT OF APPEALS
DIVISION II

2013 AUG -6 AM 9: 13

STATE OF WASHINGTON

BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42035-0-II |
| Respondent, | PUBLISHED OPINION |
| v. | |
| ROBERT LOCKE, | |
| Appellant. | |

BJORGEN, J. — Robert Locke appeals his conviction and sentence for one count of making threats against the Governor or her family. He argues that: (1) sufficient evidence does not support that he made a "true threat," as defined under First Amendment case law, or a "threat" as defined by the jury instructions; (2) the trial court erred in not including the true threat concept in the "to convict" jury instruction and the information does not contain all essential elements because it fails to refer to a "true threat"; (3) the trial court erred in not providing the jury with a *Petrich*[1] multiple acts unanimity instruction; and (4) the trial court improperly ordered Locke to have a mental health evaluation and to follow any recommended treatment as a condition of his sentence. The State concedes that the trial court improperly imposed the mental health condition. We hold that sufficient evidence supports the finding of a

---

[1] *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984).

true threat, consistently with the first Amendment, that the jury instructions were proper, and that a *Petrich* instruction was not necessary. Therefore, we affirm the conviction, but remand for vacation of the improper mental health condition.

## FACTS

In the early morning of January 25, 2011, Locke sent two e-mail messages to the Governor through a section of the Governor's web site entitled "Contact Governor Gregoire." Exh. 3 at 1, 4-5. The web page required the sender's first and last name, e-mail address, physical address, city, state, and zip code as contact information.

In his first e-mail, sent at 6:09 AM, Locke identified himself as "Robb Locke" and provided a phone number; an e-mail address, "robblocke2004@yahoo.com"; a zip code, 98334; and a state, Washington. Exh. 4. For his address, Locke entered "1313 Mockingbird Lane," an address used in the television comedy "The Munsters." Exh. 4; Report of Proceedings (RP) at 186. For his city, he entered "Gregoiremustdie." Exh. 4. His message stated,

> I hope you have the opportunity to see one of your family members raped and murdered by a sexual predator. Thank you for putting this state in the toilet. Do us a favor and pull the lever to send us down before you leave Olympia.

Exh. 4.

At 6:11 AM, Locke used the web page to send a second e-mail, providing the same contact information. His second message stated, "You fucking CUNT!! You should be burned at the stake like any heretic." Exh. 5.

Finally, at 6:13 AM, Locke accessed another section of the Governor's web site titled, "Invite Governor Gregoire to an Event." Exh. 1. Through a form on this web page, Locke requested an event, again identifying himself as "Robb Locke," noted that he lived in

2

No. 42035-0-II

Washington state, and identified his organization as "Gregoire Must DIe [sic]." Exh. 2. He requested that the event be held at the Governor's mansion and stated the event's subject would be "Gregoire's public execution." Exh. 2. He wrote that the Governor's role during the event would be "Honoree," the event would last 15 minutes, the media would be invited, and the audience's size would be greater than 150. Exh. 2.

Barbara Winkler, the Governor's executive scheduler, discovered Locke's event request when she arrived at work the morning of January 25. The request alarmed her, and she considered it as serious because it occurred shortly after a recent shooting of an elected official in Arizona.[2] She forwarded the event request to a member of the Executive Protection Unit (EPU) of the Washington State Patrol.[3]

After speaking with Winkler, Rebecca Larsen, the Governor's executive receptionist, searched the computer system for the name Locke provided in the event request and discovered the two earlier e-mails from him. Because Larsen was "alarm[ed]" by the e-mails, she printed them and gave them to the EPU. RP at 126, 128.

Washington State Patrol Sergeant Carlos Rodriguez of the EPU reviewed the e-mails and event request. After considering their content and the Arizona shootings, he interpreted them as "a serious threat to do harm to the governor." RP at 171, 178. Rodriguez reviewed the communications with Detective James Kirk of the state patrol, who dialed the

---

[2] The Arizona shooting referred to by multiple witnesses in this case was the shooting of United States Representative Gabrielle Giffords. On January 8, 2011, a gunman shot Representative Giffords and 18 other people during a public meeting held in a supermarket parking lot in Arizona.

[3] The response of law enforcement is a relevant part of the background of this appeal. It is not dispositive, however, as to whether an unprotected true threat was made.

3

telephone number provided with the e-mail. A male voice answered, and Kirk asked if he was speaking with Locke. Locke answered yes, and Kirk identified himself and said he wanted to discuss the e-mails. Locke replied, "Yeah," and either hung up or lost cellular service. RP at 204. When Kirk called back, the call went to voice mail.

Kirk and Trooper Albert Havenner went to an address believed to be Locke's residence and saw someone matching Locke's description walking down the street. Havenner contacted the individual. Locke identified himself and replied, "Yeah, I know why you're here . . . . I figured you guys would be contacting me." RP at 197. Kirk then identified himself and said he had spoken with Locke on the telephone earlier that morning. Locke replied, "[Y]eah, I want you to know . . . I didn't hang up on you, I have poor cell service." RP at 207. Kirk then transported Locke to a state patrol office.

At the office, Locke acknowledged that he sent the e-mails and an event request from a computer in his residence. He stated that he did this because, while Governor Gregoire was the attorney general, he had filed a complaint with that office about an employer depriving him of his last two paychecks, and the attorney general's office failed to follow up. In October 2010, Locke became unable to work because of a back condition, and the Department of Social and Health Services twice reduced benefits he was receiving. When Locke awoke the morning of January 25, 2011, he was angry over those circumstances and having to walk three miles to physical therapy while in pain. He described his communications to the Governor as "giv[ing] her a piece of [his] mind," but he did not recall making any direct threats to her safety and had no intention of carrying out any threats. Ex. 6 at 7, 10. He "profusely apologize[d] for [his]

4

temper" and said that "it was . . . the worst judgment" to have sent the communications, but he "needed the outlet at the moment . . . [a]nd, it was there." Ex 6 at 15.

The State charged Locke with one count of threats against the Governor or her family. A jury convicted him as charged. The trial court sentenced him to 12 months' confinement and ordered a mental health evaluation. Locke appeals.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

Locke argues that sufficient evidence does not support his making a "true threat" against the Governor under First Amendment case law or his making a "threat" as defined by the jury instructions. We disagree.

Sufficient evidence supports a conviction if, when viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime proved beyond a reasonable doubt. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). Subject to the rules governing First Amendment analysis set out below, we draw all reasonable inferences[4] from the evidence in the State's favor and interpret them most strongly against the defendant. *Hosier*, 157 Wn.2d at 8. In the sufficiency context, we consider circumstantial evidence as probative as direct evidence. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). We may infer specific criminal intent of the accused from conduct that plainly indicates

---

[4] Locke, citing *State v. Weaver*, 60 Wn.2d 87, 88, 371 P.2d 1006 (1962), argues that the State cannot rely on a "pyramiding of inferences" to demonstrate sufficient evidence supporting his convictions. Br. of Appellant at 9. Our Supreme Court, however, subsequently rejected the rule in *Weaver*, citing with approval the statement that "[i]f the inferences and underlying evidence are strong enough to permit a rational fact finder to find guilt beyond a reasonable doubt, a conviction may be properly based on 'pyramiding inferences.'" *State v. Bencivenga*, 137 Wn.2d 703, 711, 974 P.2d 832 (1999).

such intent as a matter of logical probability. *Goodman*, 150 Wn.2d at 781. Finally, we defer to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970, *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

A.     <u>True Threat</u>

Locke was convicted under RCW 9A.36.090(1), which provides:

Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the governor of the state or his or her immediate family . . . or knowingly and willfully otherwise makes any such threat against the governor . . . shall be guilty of a class C felony.

The First Amendment, applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." *Virginia v. Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003). The First Amendment, though, does not extend to speech held to be unprotected, one category of which comprises "true threats." *State v. Allen*, 176 Wn.2d 611, 626, 249 P.3d 679 (2013).

A true threat is "a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of another person." *Allen*, 176 Wn.2d at 626 (internal quotation marks omitted) (quoting *State v. Kilburn*, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004)). To avoid violating the First Amendment, our Supreme Court has held that it will "interpret statutes criminalizing threatening language as proscribing only unprotected true threats." *Allen*, 176 Wn.2d at 626. Consequently, we construe RCW 9A.36.090(1) as prohibiting only true threats.

6

A true threat is a serious threat, not one said in jest, idle talk, or political argument. *Kilburn*, 151 Wn.2d at 43 (citing *United States v. Howell*, 719 F.2d 1258, 1260 (5th Cir. 1984)). Stated another way, communications that "bear the wording of threats but which are in fact merely jokes, idle talk, or hyperbole" are not true threats. *State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010). The nature of a threat "depends on all the facts and circumstances, and it is not proper to limit the inquiry to a literal translation of the words spoken." *State v. C.G.*, 150 Wn.2d 604, 611, 80 P.3d 594 (2003). Statements may "connote something they do not literally say . . . ." *Planned Parenthood of Columbia/Willamette, Inc. v. A.L.C.A.*, 290 F.3d 1058, 1085 (9th Cir. 2002). Consistently with this recognition, our court has held that "whether a statement is a true threat or a joke is determined in light of the entire context" and that a person can indirectly threaten to harm or kill another. *See Kilburn*, 151 Wn.2d at 46, 48. Further, "[t]he speaker of a 'true threat' need not actually intend to carry it out. It is enough that a reasonable speaker would foresee that the threat would be considered serious." *Schaler*, 169 Wn.2d at 283 (citation omitted).

Because our sufficiency of the evidence determination "is the heart of the 'true threat' inquiry," it "implicates core First Amendment protection." *Kilburn*, 151 Wn.2d at 48. Accordingly, the First Amendment demands more than application of our usual standard of review for sufficiency of the evidence. *Kilburn*, 151 Wn.2d at 48-49. Instead, we must independently examine the whole record to ensure that the judgment does not constitute a forbidden intrusion into the field of free expression. *Kilburn*, 151 Wn.2d at 50. We are required to independently review only crucial facts, that is, those facts so intermingled with the legal question that it is necessary to analyze them in order to pass on the constitutional question.

No. 42035-0-II

*Kilburn*, 151 Wn.2d at 50-51. In doing so, we may review evidence in the record not considered by the lower court in deciding the constitutional question. *Kilburn*, 151 Wn.2d at 51. However, our review does not extend to factual determinations such as witness credibility. *State v. Johnston*, 156 Wn.2d 355, 365-66, 127 P.3d 707 (2006).

With these principles in mind, we turn to whether any of Locke's communications constituted a true threat. Locke's first e-mail identified his city as "Gregoiremustdie" and stated his desire for the Governor to witness a family member "raped and murdered by a sexual predator." Exh. 4. The e-mail also stated that the Governor had "put this state in the toilet" and requested that she "pull the lever to send us down before you leave Olympia." Exh. 4.

Although identifying his city as "Gregoiremustdie" is surely menacing, the force of the message itself is the desire that the Governor see a family member raped or murdered, coupled with the opinion that the Governor had put the state "in the toilet." Although crude and upsetting, this is more in the nature of hyperbolic political speech, predicting threatening personal consequences from the state's policies. Under the standards above, this does not rise to the level of a true threat, as recently defined in *Allen*.

Locke's second e-mail, sent only two minutes later, intensified in its violent tone and content. In this e-mail, Locke again identified his city as "Gregoiremustdie"; addressed the Governor with an emphatic, gender-specific epithet; and expressed his opinion that she should be "burned at the stake like any heretic." Exh. 5. Unlike the first e-mail, this expresses more than the desire that the Governor's policies will lead to horrible consequences to her family. Rather, its message, expressed twice, is that the Governor should be killed.

8

Its passive phrasing, though, blunts the implication that Locke is threatening to do this himself. As the dissent points out, Locke's message is that someone should kill the Governor, not that he intends to. The dissent argues also that since burning heretics at the stake is a historically political act, the second e-mail is removed from the realm of a true threat in the same way the first e-mail was protected by its political content. There is a conceptual gulf, though, between the first e-mail's hope that the Governor's family would suffer harm from the Governor's policies and the message of the second e-mail that the Governor should be killed in a horrible way once reserved for religious and political dissenters. The ancient political or religious pedigree of burning at the stake in no way transforms its menace into legitimate political speech today.

Even so, under *Allen*, the passive and impersonal phrasing of this sort of statement would at best reach only the margins of a true threat; viewed in isolation, we cannot deem it unprotected speech. However, it and the event request discussed below, considered together, do cross into the territory of a true threat. *See Schaler*, 169 Wn.2d at 283-84; *Kilburn*, 151 Wn.2d at 48.

Locke's event request, sent only two minutes after the second e-mail, further escalated the violent tone and content of his communications. Locke sent the request through a section of the Governor's web site entitled "Invite Governor Gregoire to an Event." Exh. 1. He identified his organization as "Gregoire Must DIe [sic]," requested that the event be held at the Governor's mansion, and stated the subject of the event would be "Gregoire's public execution," at which she would be the "Honoree." Exh. 2.

We must consider these facts in light of Locke's own admission that he was aware of Representative Giffords's shooting 17 days earlier. In such a context, a reasonable speaker

9

would foresee that the Governor would take seriously an invitation to her own public execution from "Gregoire Must DIe [sic]," especially in light of the rapid progression of Locke's communications from expressing his displeasure with her to his blunt desire for her death. Although Locke did not directly state that he himself would kill her, a direct threat is not required for his communications to constitute a true threat. *See Kilburn*, 151 Wn.2d at 48; *Planned Parenthood*, 290 F.3d at 1085.

The menace of the communication was further heightened by its specificity. Locke requested a 15-minute event at the Governor's mansion, with media present, with an audience of over 150, at which the Governor would be the honoree, and at which she would be publicly executed. These details throw the threat into higher relief and translate it from the realm of the abstract to that of the practical. They plainly suggest an attempt to plan an execution, even though Locke may have intended nothing.

Further, Locke had no preexisting relationship or communications with the Governor from which he might have an expectation that she would not take his statements seriously. *See Kilburn*, 151 Wn.2d at 52-53. In fact, all the witnesses from the Governor's office testified that they took Locke's communications as serious threats. Finally, Locke himself seemed to acknowledge that he knew his threats would be taken seriously; he admitted that he knew why the state patrol contacted him, that he expected them to do so, and that he exercised "the worst judgment" in sending the communications. Exh. 6.

The dissent asserts that the outlandishness of the event request means that no reasonable person would take it seriously. The threat, though, lay not in the possibility that the request would actually be granted or that a fire would be kindled beneath a stake. It lay, rather, in the

escalation of the communications from passive abstraction to a more detailed plan for the Governor's murder, coupled with the repeated admonition that "Gregoire must die." The dissent asserts also that the short time between the e-mails shows a continuous statement, not an escalation of threats. To the contrary, the evidence shows a rapid-fire e-mail sequence of increasing specificity and menace. If anything, the short intervals between the e-mails suggest a troubling explosiveness lying behind them. That message would be taken seriously by a reasonable person.

The dissent asserts also that Locke's messages do not disclose any serious plan to harm the Governor. Underlying planning, however, is not an essential element of a true threat. In *Schaler*, underlying planning was simply evidence of circumstances that fell into the true threat category. Further, *Schaler* itself held that the speaker of a true threat need not actually intend to carry it out. *Schaler*, 169 Wn.2d at 283. Under both *Schaler*'s rationale and its result, Locke's statements crossed well into the precincts of unprotected speech.

Finally, the contrast between the circumstances of the threat in *Kilburn* and Locke's communications highlight the more serious nature of Locke's actions. On its face, the eighth grader's statement to a classmate that he was "going to bring a gun to school tomorrow and shoot everyone and start with you" is chilling and serious. *Kilburn*, 151 Wn.2d at 39. The Court pointed out, though, that the speaker and the classmate had been talking about books they were reading and Kilburn's book involved the military and guns; that Kilburn had known the classmate for two years and had always been friendly to her; that he joked around with other students, including this classmate; and that he had been laughing when he made the statement.

11

*Kilburn*, 151 Wn.2d at 52-53. These circumstances led our Supreme Court to deem this not a true threat. Nothing approaching these circumstances is present here.

The dissent also asserts that Locke's e-mails are protected by the First Amendment because they are political speech. In support, the dissent cites the Supreme Court's recognition "'of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide[]open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Watts v. United States*, 394 U.S. 705, 708, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 116 L. Ed 2d 686 (1964)).

As set out above, we recognize that the terms of the first e-mail are of an arguably political nature, and we, too, deem it to be protected speech. Locke's own statements, however, make clear that his motivation for sending the e-mails as a whole had nothing to do with public or political matters. He was upset at Governor Gregoire because, when she was attorney general, that office failed to follow up on a private complaint he had made. He was upset more generally because his state benefits had been reduced, and he was angry at having to walk to physical therapy while in pain. Locke's threats, consequently, were an expression of undiluted ire over a private grievance with the state, of which Gregoire was then Governor. The sentiments expressed in the second and third e-mails conveyed no view or position on public issues or policies. To suggest a "profound national commitment" to the protection of such threatening outbursts risks trivializing our critical commitment to uninhibited speech on public issues, even if it crosses into the vehement and caustic. The second and third e-mails were not political speech.

Finally, the dissent notes that *United States v. Lincoln*, 403 F.3d 703, 704-05 (9th Cir. 2005), held that a true threat was not conveyed by a letter an inmate attempted to send to the President stating, in part: "You Will Die too George W Bush real Soon They Promised [sic] That you would." If Locke had confined himself to the passive, indirect hopes that the Governor or her family would be harmed, found in the first two e-mails, *Lincoln* might be dispositive. Locke continued, though, with the increasingly specific and detailed threats described above. These escalating steps forfeited any protection of his threatening speech under *Lincoln*'s rationale.

We agree wholly with the dissent that the guarantee of free speech has its most important application to those with whom we disagree. There are limits, though, to its protection, and here those limits were crossed. Whether the event request is viewed alone or together with the second e-mail, a reasonable person would foresee that it would be interpreted as a serious expression of intention to harm or to kill another person. Thus, sufficient evidence supports the finding that Locke made a true threat.

B.    Threat Jury Instruction

As part of his challenge to the sufficiency of the evidence, Locke argues also that the evidence does not support his making a "threat" as defined by the jury instructions.

Jury instruction 7 provided:

> Threat means to communicate, directly or indirectly, the intent to take the life of, or to inflict bodily harm upon the governor of the state.
> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest, idle talk, or political argument.

No. 42035-0-II

Clerk's Papers (CP) at 19.

This definition of "threat" directly included the element of true threat. Even without that, the concept of "threat" is an inherent element of the notion of "true threat." As held above, the evidence is sufficient to show that Locke made a true threat. Therefore, it is sufficient to show he made a threat.

## II. JURY INSTRUCTIONS AND THE INFORMATION

Locke contends for the first time on appeal that the trial court's decision is flawed, because both the "to convict" jury instruction and the information lacked the essential element that the threat had to be a "true threat." This argument also fails.

A.    Failure to Preserve Alleged Error

RAP 2.5(a) generally does not allow parties to raise claims for the first time on appeal. *State v. Robinson*, 171 Wn.2d 292, 304, 253 P.3d 84 (2011). RAP 2.5(a)(3), however, allows appellants to raise claims for the first time on appeal if such claims constitute manifest error affecting a constitutional right.

A claim of error is of constitutional magnitude under RAP 2.5(a)(3) when the claim, if correct, implicates a constitutional interest as compared to another form of trial error. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). An alleged error is manifest if it results in actual prejudice; that is, if it had "practical and identifiable consequences" at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011) (internal quotation marks omitted) (quoting *O'Hara*, 167 Wn.2d at 99).

By its nature, this threshold test under RAP 2.5 can bleed into an analysis of the merits of the claimed error. *See State v. Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591 (2001) (in determining

14

No. 42035-0-II

whether an error is manifest, we "preview[] the merits of the claimed constitutional error to determine whether the argument is likely to succeed"). Whichever lens is used, our Supreme Court's recent decision in *Allen* makes clear that the jury instructions and the information did not err in their treatment of the notions of threat and true threat. Therefore, Locke cannot meet the manifest constitutional error exception to RAP 2.5(a). Whether viewed under RAP 2.5(a) or on the merits, Locke's claims fail.

B.      The Jury Instructions

Jury instruction 22, the trial court's "to convict" instruction, stated in part that:

> [t]o convict the defendant of the crime of threats against the governor or family each of the following elements of the crime must be proved beyond a reasonable doubt: (1) That on January 25, 2011, the defendant, knowingly and willfully, (2) makes any threat against the governor of the state.

CP at 22. The basic concept in this instruction, that of "threat," was defined in instruction 7 in the following terms:

> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest, idle talk, or political argument.

CP at 19. Instruction 7 was identical to Washington's pattern jury instruction defining "threat." *See* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.24, at 72 (3d ed. 2008) (WPIC).

In *Allen*, the defendant was convicted of felony harassment for threatening to kill an individual. *Allen*, 176 Wn.2d at 614. Among his claims on appeal, Allen argued that the constitutional requirement of a "true threat" is an essential element of the crime and, therefore, must be stated in both the information and the "to convict" jury instruction. *Allen*, 176 Wn.2d at

15

626-27. Because that did not occur, Allen argued, his convictions were flawed. *Allen*, 176 Wn.2d at 626-27.

Our Supreme Court issued a lead opinion by four justices; a concurrence by Chief Justice Madsen; and a concurrence by Justice Chambers, joined by Justice Fairhurst. After surveying the case law, the lead opinion held that even though the "to convict" instruction did not specifically convey the elements of a true threat, those elements were conveyed by the instruction defining "threat," a term used in the "to convict" instruction. *Allen*, 176 Wn.2d at 628, 630. The lead opinion distinguished the Court's prior decision in *Schaler*, 169 Wn.2d at 287-88, which reversed a felony harassment conviction because the instruction defining "threat" was not limited to true threats. *Allen*, 169 Wn.2d at 628-29. The *Allen* court also reiterated its observation in *Schaler* that WPIC 2.24 had been amended to include the definition of "true threat," and that "'[c]ases employing the new instruction defining 'threat' will therefore incorporate the constitutional mens rea as to the result.'" *Allen*, 176 Wn.2d at 629 (quoting *Schaler*, 169 Wn.2d at 288 n.5). The lead opinion in *Allen* also drew on the Court of Appeals decision in *State v. Tellez*, 141 Wn. App. 479, 484, 170 P.3d 75 (2007), which held that the true threat concept is not an essential element of felony telephone harassment and need not be included in the "to convict" instruction, as long as the instruction defining "threat" is limited to true threats. *Allen*, 176 Wn.2d at 630. The *Allen* lead opinion expressly adopted the holding that "the true threat requirement is not an essential element of felony harassment and that the instruction defining 'true threat' in this case safeguarded Allen's First Amendment rights." *Allen*, 176 Wn.2d at 632.

No. 42035-0-II

As noted, instruction 22, the "to convict" instruction, stated in part that to convict the defendant it must be proved that he knowingly and willfully made a threat against the Governor. Instruction 7, which is consistent with the version of WPIC 2.24 approved by *Schaler*, then defined "threat" in the following terms:

> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest, idle talk, or political argument.

CP at 19.

This instruction's language is identical to the passage in the definitional instruction approved in *Allen*,[5] except for the addition of the ending reference here to "political argument." CP at 19. This ending reference, though, is expressly set out in WPIC 2.24 as approved alternative language. The constitutional contours of the notion of true threat do not vary between the crime of felony harassment at issue in *Allen* and *Schaler* and the crime of threats against the Governor at issue here. Thus, under the lead opinion in *Allen* and under *Schaler*, the instructions here were not erroneous.

C.    The Information

Locke contends also that the information does not contain all essential elements of the crime.

The relevant part of the information stated:

---

[5] We acknowledge that the *Allen* lead opinion was by a plurality of four justices. However, Justice Chambers's concurring opinion, joined by Justice Fairhurst, expressly agreed with the lead opinion that "true threat" need not be pleaded in the information or included in the "to convict" jury instruction. *Allen*, 176 Wn.2d at 634.

17

> ROBERT RAY LOCKE . . . did unlawfully, feloniously, knowingly, and willfully deposit for conveyance in the mail or for delivery from any post office or by any letter carrier a letter, paper, writing, print, missive or document which contained a threat to take the life of or to inflict bodily harm upon the governor of the State of Washington . . . or did knowingly and willfully otherwise make any such threat against the governor.

CP at 1.

All essential elements of a crime, statutory or otherwise, must be included in an information. *State v. Kjorsvik*, 117 Wn.2d 93, 97, 812 P.2d 86 (1991). When a defendant challenges the sufficiency of the information for the first time on appeal, we liberally construe the document in favor of its validity. *Kjorsvik*, 117 Wn.2d at 105-06. We consider (1) whether the necessary facts appear in any form, or by fair construction can be found, in the charging document; and, if so, (2) whether the defendant can nonetheless demonstrate actual prejudice suffered as a result of the imprecise, vague, or ambiguous charging language. *Kjorsvik*, 117 Wn.2d at 105-06. The primary goal of the essential elements rule is to provide constitutionally mandated notice of the charges to the defendant. *Kjorsvik*, 117 Wn.2d at 97, 101. This goal is met where a fair, commonsense construction of the charging document "would reasonably apprise an accused of the elements of the crime charged." *Kjorsvik*, 117 Wn.2d at 109. "Words in a charging document are read as a whole, construed according to common sense, and include facts which are necessarily implied." *Kjorsvik*, 117 Wn.2d at 109.

In *Allen*, a majority of the Court would uphold the information against the challenge that it did not adequately set out the element of a true threat. The lead opinion held that "the true threat requirement is not an essential element of felony harassment." *Allen*, 176 Wn.2d at 632. It also noted that its prior decision in *Schaler* held that the term "knowingly threaten" satisfies

18

the mens rea element as to the result, so long as "threat" is defined consistently with the true threat standard. *Allen*, 176 Wn.2d at 632 n.11 (citing *Schaler*, 169 Wn.2d at 287-88).

Just like the information upheld in *Allen*, the information in this matter charged the defendant with knowingly threatening to injure or kill the victim. Just as in *Schaler*, the charge in the information that Locke "knowingly" made a threat implies that he was aware that his words or actions frightened or threatened their recipient. Just as in *Allen*, an express definition of "true threat" was included in the jury instructions. Further, Locke was aware of and relied on the true threat concept in preparing and presenting his defense at trial. Thus, he cannot demonstrate any actual prejudice.

If the information in *Allen* adequately sets out the notion of threat, so does the information in this case. Under *Allen* and *Schaler*, we must uphold the information.

### III. UNANIMITY INSTRUCTION

Locke argues for the first time on appeal that the trial court erred under *Petrich*, 101 Wn.2d 566, in not instructing the jury that it must be unanimous as to which act or incident constitutes the charged crime. This instruction is required, Locke argues, because the two e-mails and the event requests were separate, multiple acts, any one of which could form the basis of the charge against him. The State responds that no unanimity instruction was required, because Locke's crime consisted of a continuous course of conduct. We agree with the State.

As noted, RAP 2.5(a)(3) allows appellants to raise claims for the first time on appeal if they constitute manifest error affecting a constitutional right. The failure to provide a required unanimity instruction is of constitutional magnitude. *State v. Bobenhouse*, 166 Wn.2d 881, 893, 214 P.3d 907 (2009). The error in failing to do so is manifest if the appellant can demonstrate

19

actual prejudice resulting from it; that is that the error had "practical and identifiable consequences" at trial. *Gordon*, 172 Wn.2d at 676 (internal quotation marks omitted) (quoting *O'Hara*, 167 Wn.2d at 99).

Each of these requirements demands that the alleged action, in this case the omission of a unanimity instruction, in fact be in error. The law is plain that where the evidence indicates that more than one distinct criminal act has been committed, but the defendant is charged with only one count of criminal conduct, the jury must be unanimous as to which act or incident constitutes the charged crime. *State v. Noltie*, 116 Wn.2d 831, 842-43, 809 P.2d 190 (1991); *Petrich*, 101 Wn.2d at 572. That is, the "jury must be unanimous as to *which* act or incident constitutes a particular charged count of criminal conduct." *State v. Borsheim*, 140 Wn. App. 357, 365, 165 P.3d 417 (2007).

The determination of whether a unanimity instruction is required turns on whether the prosecution constitutes a "multiple acts case." *Bobenhouse*, 166 Wn.2d at 892 (emphasis omitted). A multiple acts prosecution occurs when "several acts are alleged and any one of them could constitute the crime charged." *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). Multiple acts tend to be shown by evidence of acts that occur at different times, in different places, or against different victims. *State v. Love*, 80 Wn. App. 357, 361, 908 P.2d 395 (1996).

Courts must distinguish, though, between one continuous offense and several distinct acts, each of which could be the basis for the criminal charge. *Love*, 80 Wn. App. at 361. A multiple acts unanimity instruction is not required when the State presents evidence of multiple acts that indicate a "continuing course of conduct." *State v. Crane*, 116 Wn.2d 315, 326, 804 P.2d 10 (1991); *Love*, 80 Wn. App. at 361. "A continuing course of conduct requires

20

an ongoing enterprise with a single objective." *Love*, 80 Wn. App. at 361. To determine whether multiple acts constitute a continuing course of conduct, we evaluate the facts in a commonsense manner. *Love*, 80 Wn. App. at 361.

Washington courts have found a continuing course of conduct in cases where multiple acts of the charged crime were committed with a single purpose against one victim in a short period of time. For example, the *Crane* court applied the continuing course of conduct exception to multiple acts of assault against a child victim over a two-hour time period, ending in the child's death. *Crane*, 116 Wn.2d at 330. Similarly, we held in *State v. Marko*, 107 Wn. App. 215, 221, 27 P.3d 228 (2001), that a defendant's statements to two different people over a period of 90 minutes constituted a continuous course of conduct for the crime of intimidating a witness.

As held above, Locke's event request and the second e-mail together constituted the charged crime of threats against the Governor. Locke sent all three of his communications within the short span of four minutes. He sent them from the same location, his residence's computer, to the same location, the Governor's office. Furthermore, all three communications served the same objective of communicating, at the very least, Locke's desire that the Governor or her family be harmed or killed. Accordingly, the facts here demonstrate a continuous course of conduct, and no multiple acts unanimity instruction was required.[6] Locke fails to demonstrate a manifest error allowing him to raise his claim for the first time on appeal under RAP 2.5(a).

## IV. MENTAL HEALTH EVALUATION

Finally, Locke argues that the trial court improperly ordered a mental health evaluation and recommended treatment as a condition of his sentence without making statutorily-required

---

[6] Although not multiple acts for *Petrich* purposes, Locke's e-mails were a "course of conduct" of increasingly specific and menacing statements as described in part I. A. above.

No. 42035-0-II

findings. The State concedes that the trial court improperly imposed this sentence condition. The trial court did not obtain the pre-sentence report required by RCW 9.94B.080[7] before requiring a mental health evaluation. Therefore, we accept the State's concession and we remand for the trial court to vacate this sentence condition.

We affirm the conviction, but remand for vacation of the mental health condition.

BJORGEN, J.

I concur:

HUNT, J.

---

[7] Although by its terms chapter 9.94B RCW appears to apply only to sentences imposed before July 1, 2000, an uncodified portion of the statute makes clear that the provision also applies "to all sentences imposed after August 1, 2009, for any crime committed on or after the effective date of this section. LAWS OF 2008, ch. 231, § 55 (referring to LAWS OF 2008, ch. 231, § 53, *codified at* RCW 9.94B.080).

No. 42035-0-II

JOHANSON, A.C.J. (dissenting) — It is easy to believe in freedom of speech for those with whom we agree. The First Amendment, however, also protects those with whom we disagree. Here the majority holds that Locke's second e-mail and his event request, when read together, constitute a true threat to former Governor Christine Gregoire, who served in that position from 2005 through 2013. I disagree because even when the evidence is viewed in the light most favorable to the jury's verdict, no rational trier of fact could conclude that Locke's statements constitute a true threat. Because Locke's statements lack the indicia of true threats and because his speech was political in nature, the First Amendment protects Locke's statements and I would reverse.

A. Locke's Statements Do Not Bear Indicia of True Threats

Locke's passive statements lack the indicia of true threats required under Washington law. A true threat is "a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted as a serious expression of intention to inflict bodily harm upon or to take the life of another person." *State v. Kilburn*, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004) (quoting *State v. Williams*, 144 Wn.2d 197, 208-09, 26 P.3d 890 (2001)). Because here Locke challenges the sufficiency of the evidence, we must determine whether, viewing the evidence most favorably to the State, any rational trier of fact could find a true threat. *See State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). Additionally, since Locke's constitutional right to free speech is implicated, we may examine the entire record, including evidence that the trial court did not consider. *Kilburn*, 151 Wn.2d at 51. We also scrutinize political speech more rigorously than other types of speech. *See Collier v. City of Tacoma*, 121 Wn.2d 737, 746, 854 P.2d 1046 (1993) (citing *Metromedia, Inc. v. City of San*

23

*Diego*, 453 U.S. 490, 513, 101 S. Ct. 2882, 69 L. Ed. 2d 800 (1981)). Locke's statements, however, do not convey a serious expression of his intent to harm.

First, Locke's statement, "You should be burned at the stake like any heretic," Ex. 5, was not a true threat because (1) Locke does not express a serious intent to harm Governor Gregoire, therefore a reasonable person in his position would not foresee that the statement would be interpreted as a serious expression of an intent to inflict harm; and (2) the statement involved a historically political event.

Locke's e-mail states his belief that it would be appropriate to burn the governor at the stake because she is a heretic. While offensive, this statement does not convey, either directly or indirectly, a serious intent to harm Governor Gregoire. A reasonable speaker in Locke's position would not have expected anyone to interpret this statement as a serious expression of intent to harm Governor Gregoire because it does not convey that Locke personally intended or planned to burn the governor at the stake. Moreover, the impracticality of accomplishing this threat underscores its unreasonableness. Locke has serious political disagreements with former Governor Gregoire and is angry with her. It is not reasonable, as the majority contends, that he should have foreseen that the governor would actually think that he intended to drive a stake into the ground and burn her on it. A reasonable person would not interpret Locke's anger with former Governor Gregoire, stated distastefully, as a serious intent to personally harm her.

Furthermore, burning heretics at the stake is a historically political act of persecution, usually perpetrated against those with beliefs outside the political or religious mainstream. Like the first e-mail, which the majority held constituted political speech, the e-mail calling for the heretical Governor Gregoire to be burned at the stake, too, possesses the political overtones

traditionally protected by the First Amendment. *See e.g., Grayson v. Schuler*, 666 F.3d 450, 453 (7th Cir. 2012) (noting that the First Amendment protects the religious rights of heretics). Because burning heretics at the stake is both impractical and historically symbolic of political dissent, based on the entire record in this case, no rational trier of fact could find that Locke's e-mail was a true threat.

Second, Locke's event request was not a true threat. He invited the governor to participate in her own public execution. Locke never issued a threat in the event request. He never described any plan or intent to harm Governor Gregoire, or even indicated a desire to participate. Furthermore, the outlandishness of the request itself does not convey a serious intent to inflict harm. The event request was just that—a request that Governor Gregoire agree to participate in her own public execution—an outcome no reasonable person would foresee and no rational trier of fact could conclude establishes a serious expression of intent to harm.

Finally, the majority argues that the final two communications, taken together, indicate a progression to a "more detailed plan" and, therefore, a reasonable person could easily foresee that, in combination, the messages demonstrate a serious intent to do bodily harm. Majority at 11. The facts, however, do not support this finding.

The event request included only four details: the location of the event, its length, who should attend, and the "[h]onoree." Ex. at 2. Of these facts, none makes it more likely that, in context, Locke had a serious and legitimate plan to kill or do serious bodily harm to Governor Gregoire. Nor do any of these details show a progression or escalation from the previous message, sent just two minutes prior, stating that Governor Gregoire "should be burned at the stake like any heretic." Ex. 5. At trial, Governor Gregoire's executive scheduler testified that

Locke chose 15 minutes as the anticipated time for his event. She also stated that this was the website's default choice, indicating no planning at all. Locke did not make only default selections. But as he stated in his interview with the Washington State Patrol, he was just "flippantly checking off things," again indicating very little planning. 2 Verbatim Report of Proceedings at 212. More importantly, the presence of the media, the number of attendees, and the choice of the governor's mansion as the location for this event do not make the threat more legitimate or reasonable. If anything, in the context of an online event invitation, the addition of those details exacerbates the ridiculousness of Locke's request.

Locke's statements, in fact, are not an escalation or progression established by three discrete messages but rather, one continuous statement. He submitted three communications through Governor Gregoire's public website in just four minutes; an e-mail at 6:09 AM, a second e-mail at 6:11 AM, and the event request at 6:13 AM. It was not possible for him to spend any meaningful amount of time considering and formulating a "more detailed plan" if only two minutes elapsed between each communication. The majority's reliance on the escalation from one message to the next confirms that the messages are, in fact, connected. That the statements are connected is particularly significant because, as the majority holds and I agree, the first e-mail was political speech and political speech receives more strident protection. *Collier*, 121 Wn.2d at 746.

B. Case Law

The majority cites *Kilburn* for the proposition that indirect statements may constitute true threats and that the speaker need not intend to carry out the threat in order for it to be a true threat. Majority at 7, 10. In *Kilburn*, Kilburn, an eighth grader, told his classmate, K.J., half-

smiling, "'I'm going to bring a gun to school tomorrow and shoot everyone and start with you,'" "'maybe not you first.'" 151 Wn.2d at 39. They had been talking about books they were reading, and Kilburn's book involved the military and guns. *Kilburn*, 151 Wn.2d at 52. Kilburn had also known K.J. for two years and he had always been friendly to her, he joked around with classmates, including K.J., he had been laughing when he made the statement, and he did not scare K.J. with the statement because she was not sure if he was joking or not. *Kilburn*, 151 Wn.2d at 52-53.

Our Supreme Court held that Kilburn's statement did not constitute a true threat because Kilburn: (1) made the statement in the context of the conversation about their books; (2) had an amicable past relationship with K.J.; (3) laughed when he made the comments; and (4) had joked with K.J. and her classmates before. *Kilburn*, 151 Wn.2d at 53. Therefore, the court held that a reasonable person in Kilburn's position would foresee that his comments would not be interpreted seriously. *Kilburn*, 151 Wn.2d at 53.

Like in *Kilburn*, here a reasonable person in Locke's position would not foresee that Locke's e-mails and event request would be interpreted as a serious threat that Locke intended to harm Governor Gregoire. Locke stated a mere belief that Governor Gregoire was a heretic and requested that she agree to participate in her own public execution. Locke did not indicate that he would personally carry out these acts, nor did the record demonstrate that he would have the means or opportunity to actually force her onto a stake or to coerce her into participating in her own execution. Here the context makes it clear that Locke made no true threat. Locke's e-mail, stating his belief that the governor should be burned at the stake like a heretic, and his request that she agree to participate in her own execution both lacked an express statement of Locke's

serious intent to harm or participate at all. Moreover, the language and context in which Locke made his statements were not nearly so direct or intentional as Kilburn's.

The majority also relies on *State v. Allen* to establish the definition of a true threat. 176 Wn.2d 611, 626, 249 P.3d 679 (2013). And although *Allen* applies the same definition as the *Kilburn* court, the *Allen* court's decision is distinguishable from this case factually and legally. *Allen*, 176 Wn.2d at 626. In *Allen*, Bryan Allen and another man approached Gerald Kovacs and offered to sell him marijuana. *Allen*, 176 Wn.2d at 613-14. Kovacs became irritated and gave an expletive-laden response. *Allen*, 176 Wn.2d at 614. Allen and his colleague cursed back at Kovacs and began to follow him. *Allen*, 176 Wn.2d at 614. One of the men told Kovacs that "I'm going to kill you [Kovacs]" before lifting up his shirt to display what Kovacs believed was a gun. *Allen*, 176 Wn.2d at 614. *Allen* is factually distinguishable because Allen made a threat directly to Kovacs and backed up his threat by brandishing a firearm, making the threat more serious and credible. While any rational trier of fact could find that Allen's actions constituted a true threat, the same cannot be said about Locke's. Locke, again, never met the governor and his communications were made by e-mail through a public website and not to her directly. Unlike Allen's gun, the second and third messages that Locke sent did not add credibility to the threat; they were connected to the first message and, if anything, made his threat seem more improbable. Locke was clear that his anger was based on the effect of former Governor Gregoire's policies and her conduct in office arguing that she had put "this state in the toilet." Ex. 4. Factually, *Allen* is clearly distinguishable.

Additionally, our Supreme Court in *Allen* did not consider whether a true threat existed and, thus, *Allen* offers no guidance on what constitutes a true threat. The issue before the *Allen*

28

court was "[w]hether the 'true threat' requirement of an antiharassment statute is an essential element of the offense that must be pleaded in the information and included in the 'to-convict' instruction." *Allen*, 176 Wn.2d at 616. The Supreme Court did not analyze whether the facts of that case established a true threat or what other factors might be probative in future cases, thus, *Allen* does not guide us on that issue. Any rational trier of fact would see that Locke's communications are more like *Kilburn*, hyperbolic and consistent with the context of his history with former Governor Gregoire, and not like *Allen* which dealt with a clear, direct threat of violence by brandishing a firearm.

Perhaps the most important distinction between this case and *Kilburn* and *Allen* is that Locke's speech was political. Political speech, under Washington law, receives "greater protection over other forms of speech." *Collier*, 121 Wn.2d at 746 (citing *Metromedia, Inc.*, 453 U.S. at 513). In *Kilburn*, an eighth grader told a friend that he was planning to bring a gun to school. *Kilburn*, 151 Wn.2d at 39. In *Allen*, the defendant brandished a gun and threatened to kill a passerby. *Allen*, 176 Wn.2d at 614. Locke's speech, though crude and abusive, is distinguishable from these cases in that it is undeniably political. His first message stated, sarcastically, "Thank you for putting this state in the toilet." Ex. 4. Even in the context of Locke's other messages, this is a political statement: Locke was angry about the direction in which the governor was leading the state. Here, the majority overemphasizes the tragic shooting of former Congresswoman Giffords and does not even mention Locke's personal history with Governor Gregoire's policies in its analysis of relevant context. Majority at 9. His anger and political dissent are typical responses to that history and should be considered in our analysis. Contrary to the majority's contention, the fact that Locke's complaint is over the personal impact

29

of former Governor Gregoire's policies does not negate the political nature of his speech and his concerns. Although his chosen mode of expression may be offensive, Locke's anger is, at bottom, over the former governor's performance and policy choices. Because Locke's statements were political in nature, our review of Locke's e-mails and event request should, in light of *Collier*, be more deferential than the scrutiny applied in *Allen* or in *Kilburn*.

As the United States Supreme Court stated in *Watts v. United States*, regardless of the quality of Locke's speech, it must be viewed "'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" 394 U.S. 705, 706, 708, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)) (holding that a man who, in protesting the draft, stated, "'If they ever make me carry a rifle the first man I want to get in my sights is L.B.J,'" did not make a true threat).[8]

In *United States v. Lincoln*, a man incarcerated at the Oregon State Penitentiary wrote statements in a workbook that threatened the life of President Bush. 403 F.3d 703, 704 (9th Cir. 2005). During a follow-up interview, Lincoln told a federal agent that he was planning to assemble a team to go to Washington, D.C. to kill the president. *Lincoln*, 403 F.3d at 704. No charges were filed until six months later when Lincoln attempted to mail a threatening letter to the president. *Lincoln*, 403 F.3d at 704. The letter stated, "You Will Die too George W Bush

---

[8] It is important to note that no case law supports the proposition that the response of law enforcement is dispositive of whether a true threat exists. The Executive Protection Unit is, appropriately, designed to be overly cautious in protecting the governor and his or her family. When political speech is restricted, however, we must be careful to analyze the speech considering the entire context and separate from the response of law enforcement.

real Soon They Promissed [sic] That you would." *Lincoln*, 403 F.3d at 705. The Ninth Circuit Court of Appeals held, however, that despite his specific plan to attempt an assassination, Lincoln's letter was not a true threat because it did not "connote anything that it [did] not literally say," meaning that the letter only included indirect threats that some other entity would kill the president. *Lincoln*, 403 F.3d at 707.

The Ninth Circuit distinguished Lincoln's case from the true threat in *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003), because Lincoln's letter was written directly to President Bush and because it was an isolated incident. *See Lincoln*, 403 F.3d at 706-07. The Ninth Circuit found that these factors were important contextual elements because, unlike the posters in *Planned Parenthood* that were posted publicly and on the internet, there was no implication that Lincoln's letter was intended to encourage others to act. *Lincoln*, 403 F.3d at 707.

Like the letter in *Lincoln*, Locke's messages were for Governor Gregoire and Governor Gregoire alone. The messages do not incite others to harm or even to criticize Governor Gregoire but express Locke's own anger with her leadership. Locke's messages did not include direct threats of harm and did not indicate any serious plan. Unlike the defendant in *Lincoln*, Locke regretted sending the messages and said that he just "needed the outlet" to vent his anger and frustration. Ex. 6 at 15. Moreover, Locke's three communications were sent in a single four-minute period, indicating that there was no legitimate, developed, long-term plan like in *Lincoln*.

No. 42035-0-II

While highly offensive and inappropriate, neither the e-mails nor the event request conveyed a serious and reasonable expression of intent to actually harm the governor. Not only do Locke's e-mails and the event request lack the indicia of true threats under Washington law, they are clearly political in nature and are thus afforded more protection. And while it is certainly reasonable that Locke might realize that his word choice was poor, no rational trier of fact could find, based on the entire record, that Locke's statements were a true threat. Accordingly, I would reverse because Washington law and the First Amendment protect Locke's speech.

Johanson, A.C.J.