# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73701-5-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ANDREW BARTHOLOMEW FAST, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 6, 2017 |

TRICKEY, A.C.J. — Andrew Fast appeals his conviction of harassment–domestic violence based on his alleged threat to kill his wife Andrea Fast[1] that placed Jacob Altinger in reasonable fear that the alleged threat would be carried out. Fast argues that his conviction violates his First Amendment rights because the State failed to prove that his statement amounted to a true threat. Because it was not foreseeable from Fast's perspective that his response to a question posed by Altinger would be construed as a serious expression of intent to inflict bodily harm on Andrea, we agree. We reverse and dismiss his conviction for harassment–domestic violence as charged in count II.

## FACTS

Andrea and Fast were married in 2009. They had two daughters together. Fast joined the military and was deployed overseas four times. Their relationship was strained due to the infidelity of both parties, financial concerns, and emotional support issues.

---

[1] Andrea Fast will be referred to as "Andrea" in this opinion to avoid confusion. No disrespect is intended.

In May 2014, Altinger, who had served with Fast in the military, moved into the same apartment complex as the Fasts. In late May or June 2014, Andrea and Altinger began a romantic relationship. Altinger told Fast about the affair. Eventually, Altinger ceased most of his contact with the Fasts until February 2, 2015.

Andrea enrolled at Shoreline Community College in the fall of 2014. At Shoreline Community College, Andrea met and began dating Reece Cabe. On February 1, 2015, Andrea and the children returned to the apartment after spending the weekend at Cabe's home. When Andrea arrived at the apartment, Fast was there. He told Andrea he had quit his job. Andrea put the children to bed and she and Fast had a calm conversation about Fast quitting his job and Andrea's relationship with Cabe, including that she had spent the weekend at Cabe's house. After the conversation, they both went to sleep as normal.

The next morning, Andrea woke up for school and heard Fast asking their eldest daughter where Andrea and the children had been the night before. Their daughter responded that they had been at Kim's house, one of Andrea's female friends. Andrea had previously told their daughter to tell Fast that Andrea and the children were at Kim's house, when they were at Cabe's house.

Fast was upset that Andrea had instructed their daughter to lie to him, and that his daughter had in fact lied to him. Fast threatened to kill Andrea, the children, and himself, and described how he would kill Andrea.

Andrea did not feel safe and wanted to leave. Andrea left the apartment with their infant daughter to go to school. Andrea did not call the police because Fast had previously threatened to commit suicide by police.

Andrea called Altinger and left a detailed voice mail message telling him that she did not feel safe and was leaving Fast. She asked him to distract Fast so that she could pack and leave the apartment. Andrea called Altinger later that day and repeated what she had said in her voice mail message. Altinger did not get a sense that Andrea's request was urgent from her call.

Cabe drove Andrea back to the apartment after school. Fast was lying on the couch when Andrea entered the apartment. Her journal was on a table near Fast. A diaper bag had been cut open and several other items were broken and left around the apartment. Fast confronted Andrea while holding her journal and his pistol. Although Fast looked angry, he did not point the pistol at Andrea or threaten her with it.

Andrea ran out of the apartment and went to Altinger's apartment. Fast did not follow her. She told Altinger what had happened and that she was leaving right then and needed his help. She suggested that Altinger get several more people to help him distract Fast. Altinger agreed to help her, and Andrea went to get her suitcases.

Altinger stated that he was familiar with Andrea and Fast's history of arguing and Fast's temperament. Altinger had observed Fast becoming very angry while driving, Fast telling Altinger that he would kill himself before being arrested by

3

police, and Fast admitting once that he had pushed Andrea around and destroyed items in the apartment.

Altinger texted Brian DeMarco and Ryan Dundon to help with distracting Fast. Fast came and knocked on Altinger's apartment door shortly thereafter. Fast had his pistol with him. Altinger testified that Fast appeared upset and had Andrea's journal, which he began to read out loud. DeMarco and Dundon arrived soon after. They did not detect any hostility or agitation from Fast.

Fast, Altinger, DeMarco, and Dundon talked for about an hour. Although the conversation was relaxed, Altinger was very tense. Altinger asked to see Fast's pistol in order to disarm him, but Fast declined because he did not know DeMarco.

Andrea texted Altinger to say that she was done packing and was leaving the apartment. Fast got up and said that he had to leave and go clean up his apartment. Fast pushed past Altinger to move toward the door. Altinger went to the kitchen and grabbed an empty liquor bottle and tossed it to DeMarco and took another in his hand. Altinger moved between Fast and the door, pushed Fast in the chest, and told Fast that he needed to stay.

Fast took his gun out with the barrel pointing toward the floor.[2] Altinger raised the bottle and told Fast that Fast did not want to shoot anyone, and that he should put the pistol down. Fast replied that Altinger should not be so sure that Fast was unwilling to shoot anyone, which Altinger interpreted as intimidation. Fast

---

[2] DeMarco testified that Fast actually pointed the gun at Altinger.

4

eventually placed the gun on the table but kept his hand on it; Altinger lowered the bottle.

Altinger told Fast that Andrea had just packed her things and left with the children, that Altinger knew what had happened that morning between Fast and Andrea, and that Fast needed to stay calm and remain in Altinger's apartment.

Altinger asked Fast how he could know that Andrea and the children would be safe if he let Fast out of the apartment, to which Fast replied that Altinger did not and could not know. Fast did not explicitly tell Altinger that he was going to hurt Andrea or the children. Rather, Altinger was worried for Andrea's safety based on what Andrea had told him earlier.

After about 20 minutes, Altinger allowed Fast to leave the apartment. Altinger called Andrea to tell her what happened, and encouraged her to call the police. Andrea called the police, who noted that threats to kill her had been implied.

Fast returned to his apartment to clean up and write a letter to Andrea before leaving. Fast was arrested several days later when he returned to the apartment.

Fast was charged by amended information with two counts of felony harassment—domestic violence. The first count alleged that he threatened to kill Andrea and their children and thereby placed Andrea in reasonable fear that the threat would be carried out. The second count alleged that Fast threatened to kill Andrea and thereby placed Altinger and DeMarco in reasonable fear that the threat would be carried out. The State alleged he was armed with a handgun in the second count.

5

Fast testified that he knew he had anger issues and that they affected his marriage. But he denied ever making threats to harm or kill Andrea. Fast testified at trial that when he said Altinger could not know that Fast would not hurt anyone, he meant that there was no trust between him and Altinger, not that he was threatening Andrea. At an earlier interview, Altinger was asked, "Have you ever witnessed what you would consider a legitimate threat by [Fast] to kill his wife, Andrea?"[3] Altinger responded that he had not.[4] He also testified that he had not personally witnessed anything he would consider a threat to Fast's children.

The jury found Fast not guilty of both counts of felony harassment, but convicted him of two lesser included gross misdemeanor counts of harassment–domestic violence. The jury found that Fast was not armed with a firearm. Fast appeals his conviction on the second count of harassment–domestic violence.

## ANALYSIS

### True Threat

Fast challenges the sufficiency of the State's evidence supporting his second count of harassment–domestic violence. Fast argues that the First Amendment protects his statement to Altinger because it was not a true threat. The State contends that a reasonable person would have foreseen that Fast's statement would be interpreted as a true threat, and that Fast essentially admitted to this. Because from Fast's perspective a reasonable person would not foresee

---

[3] Report of Proceedings (RP) (May 5, 2015) at 286.
[4] Altinger stated that the investigator had been asking whether he had witnessed a legitimate threat that Fast would kill himself. His testimony then returns to whether he was put in fear for Andrea's life based on the events in his apartment. This change in topic was not directly clarified at trial or by the parties here.

his failure to reassure Altinger that he would not harm Andrea as being construed as a serious threat of bodily harm, we agree with Fast.

The State must prove each element of a charged crime beyond a reasonable doubt. U.S. CONST. amend. XIV; State v. Deer, 175 Wn.2d 725, 731, 287 P.3d 539 (2012). When reviewing the sufficiency of the evidence to support a criminal conviction, we examine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis omitted). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

> (1) A person is guilty of harassment if:
> (a) Without lawful authority, the person knowingly threatens:
> (i) To cause bodily injury immediately or in the future to the person threatened or to any other person; or
> (ii) To cause physical damage to the property of a person other than the actor; or
> (iii) To subject the person threatened or any other person to physical confinement or restraint; or
> (iv) Maliciously to do any other act which is intended to substantially harm the person threatened or another with respect to his or her physical or mental health or safety; and
> (b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out.

RCW 9A.46.020(1)(a)(i)-(iv), (b).

If a statute criminalizes speech, including threats against others, the State must show that the proscribed speech does not fall within the protections of the First Amendment. State v. Kilburn, 151 Wn.2d 36, 41-43, 84 P.3d 1215 (2004);

*State v. Williams*, 144 Wn.2d 197, 206-07, 26 P.3d 890 (2001). The First Amendment does not protect "true threats." *Kilburn*, 151 Wn.2d at 43. Therefore, a conviction for harassment requires that the State prove that a "true threat" was made, along with the additional statutory elements of the crime. *Kilburn*, 151 Wn.2d at 54.

"A 'true threat' is 'a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life' of another person." *Kilburn*, 151 Wn.2d at 43 (internal quotation marks omitted) (quoting *Williams*, 144 Wn.2d at 208-09). RCW 9A.46.020 does not require a literal translation of the words spoken to constitute a true threat; the nature of a threat depends on all facts and circumstances. *State v. C.G.*, 150 Wn.2d 604, 610-11, 80 P.3d 594 (2003). Jokes, idle talk, or hyperbole do not constitute true threats even if they contain threatening wording. *State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010). "[T]he First Amendment does not require that the speaker intend to carry out a threat for it to constitute a true threat." *Kilburn*, 151 Wn.2d at 46.

Because the First Amendment is implicated in the analysis of true threats, an appellate court conducts a limited independent review of facts critical to the true threat inquiry. *Kilburn*, 151 Wn.2d at 50. Such facts are those "so intermingled with the legal question that it is necessary to analyze them in order to pass on the constitutional question." *State v. Locke*, 175 Wn. App. 779, 790, 307 P.3d 771 (2013). We may review evidence in the record not considered by the lower court

8

in deciding the constitutional question. Kilburn, 151 Wn.2d at 51. But we will not review factual determinations, such as witness credibility. State v. Johnston, 156 Wn.2d 355, 365-66, 127 P.3d 707 (2006).

"[W]hether a true threat has been made is determined under an objective standard that focuses on the speaker," not the listener. Kilburn, 151 Wn.2d at 44.

Fast's second count of harassment–domestic violence was based on his response to Altinger's question as to whether Altinger could be sure that Fast would not hurt anyone if Altinger let him out of the apartment. Fast's statement to Altinger did not constitute a true threat under an objective standard focusing on Fast's perspective. Altinger asked Fast how Altinger could be sure that no one would be harmed if he let Fast out of the apartment. Fast's response, stating that there was no way Altinger could know, is essentially a non-response to the question, rather than a serious expression of intention to inflict bodily harm. Altinger acknowledged that he provoked the response from Fast.

Fast testified that he intended to convey to Altinger that there was no trust between them. Further, the statement was made in the context of a tense argument between the parties. There is little indication that any other response would have been more likely to convince Altinger that Andrea would be safe if he let Fast out of the apartment. In the context of the situation, Fast's response to Altinger's question is insufficient to rise to the level of a serious expression of intent to inflict bodily harm on Andrea.

Altinger testified that Andrea's prior disclosures to him, not Fast's statement, led him to fear for Andrea and the children's safety. The fact that Altinger did not

9

view Fast's statement as a legitimate threat of harm toward Andrea weighs in favor of Fast's perception that his statement conveyed the lack of trust between him and Altinger. This reduces the foreseeability of his statement being taken as a serious intention to inflict bodily harm on Andrea or the children from Fast's perspective.

The State argues that, because Fast was very angry and tense when he made the statement, Fast should have foreseen that Altinger would consider his statement a threat against Andrea. But the fact that a statement is made in the context of a tense situation does not necessarily elevate it to the level of a true threat. Williams, 144 Wn.2d at 209-10. Fast's anger and the tension between him and Altinger do not transform his response to Altinger's question into a true threat. Fast's testimony regarding his true intent, together with the fact that Altinger's concern for Andrea's safety originated from Andrea's statements, rather than Fast's, outweigh the fact that Fast's statement was made in a tense situation between him and Altinger.

The State argues that Fast essentially admitted that under the circumstances he understood how Altinger would fear that he was going to harm Andrea and the children. During cross-examination, Fast responded to the prosecutor that he could see how DeMarco and Altinger would have been concerned about letting him leave Altinger's apartment when Andrea was in their apartment. Fast's testimony at trial explained his understanding of Altinger's and Demarco's perspectives. At the time, Altinger was preventing Fast from leaving Altinger's apartment and was holding a liquor bottle in a threatening position. From Fast's perspective, it would not be reasonably foreseeable that his response to

Altinger's question would be interpreted as a serious threat of harm against Andrea. Fast's statement that he could see how, in hindsight, DeMarco and Altinger would be concerned if he left the apartment, does not establish that their fear or concern was reasonably foreseeable to Fast at the time he made the statement.

In sum, Fast's statement was not a true threat under the First Amendment. Fast's actual statement conveyed the lack of trust between him and Altinger, rather than an affirmative threat of bodily harm. From Fast's perspective, it was not foreseeable that his statement, intended to convey a lack of trust, would be interpreted as a serious threat of bodily harm against Andrea and the children.

Accordingly, we reverse Fast's conviction of harassment–domestic violence based on his statement to Altinger.

## Appellate Costs

Fast requests that if he does not prevail on appeal that this court exercise its discretion and not impose appellate costs under Title 14 RAP and State v. Sinclair, 192 Wn. App. 380, 367, P.3d 612, review denied, 185 Wn.2d 1034 (2016). Because Fast has prevailed on appeal, we do not address the issue.

We reverse and dismiss Fast's conviction of harassment–domestic violence as charged in count II.

Trickey, ACJ

WE CONCUR:

Spearman, J.

Dwyer, J.

11