IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32451-6-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 32452-4-III; |
| | ) | No. 32453-2-III) |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JERRY RAY MEARS, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — In three consolidated cases, a jury found Jerry R. Mears,

Sr. guilty of two counts of theft of a motor vehicle, theft of a firearm, three counts of first

degree trafficking in stolen property, third degree theft, two counts of harassment by

threats to kill, two counts of intimidating a witness, two counts of tampering with a

witness, and second degree theft. He appeals, alleging (1) sufficient evidence does not

support his tampering with a witness and intimidating a witness convictions, (2) denial of

his constitutional right to present a defense, (3) prosecutorial misconduct, (4) unanimity

instructional error, (5) failure to properly instruct the jury when an alternate juror was

substituted, (6) failure to conduct a same criminal conduct analysis on several of the

charges, (7) ineffective assistance of counsel, and (8) sentencing error relating to legal

financial obligations (LFOs) and a no-contact order. We address each of Mr. Mears' contentions, and generally[1] affirm.

## FACTS

Mr. Mears' wife, April Mears, worked as a live-in caretaker for 80-year-old Jack O'Bryan. Mr. O'Bryan lived on his son's property in a remote area of Okanogan County. Mr. Mears also stayed at the property.

On the property was a Ford F250 truck owned by Michael Brown. Mr. Brown left the truck at the O'Bryan property because he planned to sell or trade it to Mr. O'Bryan's son.

On September 3, 2013, Mrs. Mears and Mr. O'Bryan reported a theft to Okanogan County Sheriff's Office Deputy Justin Weigel. Mrs. Mears and Mr. O'Bryan told the deputy that the Ford truck and a log splitter were taken from the O'Bryan property. They reported that Mr. Mears had originally borrowed the truck, but did not return it, claiming it broke down and then claiming someone stole it. Mrs. Mears also told the officer that Mr. Mears told her he was going to take the log splitter because he felt it was "'owed to'" him. Report of Proceedings (RP) (Mar. 21, 2014) at 191.

---

[1] The sole exception is that we permit Mr. Mears to file a motion with the trial court for it to correct a possible clerical error in totaling the LFOs.

2

With the assistance of Mrs. Mears, Deputy Weigel located the truck in an alley behind a motel. Joseph Wise provided a handwritten receipt showing he recently purchased the truck from Mr. Mears for $100. After recovering the truck, Mr. Brown returned it to the O'Bryan property. Mrs. Mears expressed fear to the deputy that Mr. Mears would come back to the O'Bryan property and cause trouble.

On a separate occasion, Mr. Brown's father-in-law, Herman Mullis, reported to Deputy Weigel that Mr. Mears took his shotgun and never returned it. Prior to reporting the shotgun stolen, Mr. Brown; his wife, Laura Brown; and Mr. Mullis attempted to retrieve the gun from Mr. Mears on two occasions. On the second occasion, Mrs. Brown, Mr. Mullis, and Mr. Mears went to Walmart after Mr. Mears told them a friend had the gun and might be there. Mr. Mears then left the Walmart, leaving Mrs. Brown and Mr. Mullis behind. The gun was never recovered.

Mrs. Brown and her father later moved to the O'Bryan property to help care for Mr. O'Bryan and his property. At the time Mrs. Brown and Mr. Mullis moved to the property, Mr. Mears was no longer staying there.

Mr. Mears later sold a log splitter to Dean Tonner for $40. Mr. Tonner was concerned the log splitter was stolen based on the low price. He suspected the log splitter belonged to the O'Bryans. After confirming the log splitter was indeed stolen from the

3

O'Bryans, Mr. Tonner turned it over to the sheriff's office. Officers arrested Mr. Mears.

Under case no. 13-1-00317-0, the State charged Mr. Mears with theft of a motor vehicle for the truck, theft of a firearm for the shotgun, three counts of first degree trafficking in stolen property relating to the truck, shotgun, and log splitter, and third degree theft for the log splitter. At the time of Mr. Mears' preliminary appearance, he was ordered not to contact the State's witnesses. Specifically, he was told to, "not to contact or go to" Mr. O'Bryan's and Mr. Mullis's respective residences. RP (Mar. 21, 2014) at 291.

Approximately three weeks later, Mrs. Brown and her father, Mr. Mullis, went to a grocery store. Mrs. Brown stayed in the truck in the parking lot. Mr. Mears approached Mrs. Brown as she sat in the truck. Mr. Mears told Mrs. Brown that they were all going to jail, and he was innocent. Mrs. Brown tried to end the conversation, which made Mr. Mears angry. As Mrs. Brown rolled up the truck window, Mr. Mears told her, "'Fine, I'll just blow your f—ing heads off.'" RP (Mar. 20, 2014) at 85. Mrs. Brown took Mr. Mears' threat seriously and believed it was directed to everyone residing at the O'Bryan property.

4

Two days later, Mr. Mears came to the O'Bryan property early in the morning looking for Mrs. Mears. He was driving a silver sedan. Mrs. Mears refused to speak to him. Mr. Mullis asked Mr. Mears to leave. During trial, Mr. Mears acknowledged that he then said, "I'm going to blow your motherfucking heads off." RP (Mar. 21, 2014) at 134. Mr. Mullis took Mr. Mears' threat seriously and felt by Mr. Mears tone and actions that it was directed to all individuals on the property. Mr. Mullis again told Mr. Mears to leave and he responded, "'[Y]ou can kiss your shotgun goodbye.'" RP (Mar. 20, 2014) at 136. Mr. Mullis called the police.

Sheriff's deputies arrived and found Mr. Mears' shoes, sunglasses, and a set of keys inside Mr. O'Bryan's residence. They also observed Mr. Mears left notes throughout the house. One note stated that Mrs. Mears was the O'Bryan's "'nigger'" and another was directed to Mr. O'Bryan and that he will "'know the truth; someday the truth will come out.'" RP (Mar. 21, 2014) at 199. Mr. Mears also ransacked Mrs. Mears' room and left a knife lying on her table.

A few days later, the same silver sedan Mr. Mears was driving earlier was found abandoned on a side road. Arnold Van Hees had previously reported the vehicle stolen after he loaned it to Mr. Mears to purchase car parts and he never returned. Mr. Van Hees' vehicle contained tools and a Skill Saw valued over $1,500.

5

The State charged Mr. Mears, under case number 13-1-00347-1, with theft of a motor vehicle and second degree theft for the tools.

After Mr. Mears' second arrest, he sent a letter to Mrs. Mears that ended with "'[t]ick, tock; tick, tock'" which Mrs. Mears considered to be a threat toward her. RP (Mar. 21, 2014) at 202.

The State charged Mr. Mears, under case number 13-1-00350-1, with harassment by threats to kill involving Mrs. Brown, two counts of harassment by threats to kill involving Mr. Mullis, intimidating a witness involving Mrs. Brown, two counts of intimidating a witness involving Mr. Mullis, tampering with a witness involving Mr. O'Bryan, and tampering with a witness involving Mrs. Mears.

All three cases were set for trial on November 5, 2013. The trial court, at defense counsel's request, granted trial continuances on November 4, and again on November 25. On January 13, 2014, the parties agreed to consolidate the three cases. Also in January, the trial court granted defense counsel's request to continue the cases out two trial settings to March 4. As that date approached, two other trials were set to start ahead of Mr. Mears' trial. The trial court indicated that if Mr. Mears' trial did not start the following week, it would carry the trial setting over to the week of March 17.

6

On March 19 at 3:00 p.m., Mr. Mears provided the State with a revised witness list. The list included four previously undisclosed witnesses without listing the subject of their testimony. Three were family members of Mr. Mears and one was the defense investigator.

Trial began on March 20. Prior to the start of testimony, the State requested to suppress three of the witnesses disclosed at 3:00 p.m. the day before. The prior day's disclosure contained only the names of the witnesses, not their statements. The morning of trial, the State received an e-mail disclosing the particulars:

> Koeetia Mears: April and Jack came to her residence when jerry [sic] was arrested. Jack said Jerry had permission to sell truck.
> Shelby Mears: Jack was crying and in tears when he told Shelby that "jerry [sic] had been wronged" regarding the theft of the truck.
> Jerry Mears Jr.: was on [sic] jail visiting booth with April who was crying saying "they're making me do this[.]"

Br. of Appellant, App. C.

Defense counsel contested the request, arguing the witnesses were in the police report, and therefore the State was on notice that they may be called. Defense counsel advised the trial court that it would not object to a trial continuance so the State could interview the new witnesses. The court noted that the case had been continued multiple times and denied the remedy of a continuance. The court determined that Mr. Mears failed to comply with CrR 4.7(b)(1). After reviewing what the witnesses would testify

7

about (which consisted mainly of hearsay statements), the court elaborated, "it doesn't comply with the discovery, that . . . . Well, the . . . violation—can't find it's made in bad faith, however, it's an act of delay that may be viewed in some aspects as to the terminology of willfulness . . . . [T]here is a conscious decision not to get this done in a timely manner." RP (Mar. 20, 2014) at 160.

During closing arguments, the prosecutor commented, "He's charged with tampering; arguably the threats to kill were directed towards the group of them. But in this case he—came back to the property, entered the house where Mrs. Mears and Mr. O'Bryan were living, left his notes—the notes around there, destroyed her stuff,—they were witnesses from the very outset of the case." RP (Mar. 21, 2014) at 398. The prosecutor continued, "he basically—gone into the house where they resided, left threatening notes, basically tore the place up where he had no right to be. He continued to send letters to Mrs. Mears even after the fact, even after, again, he was told not to contact witnesses or victims." RP (Mar. 21, 2014) at 408. The prosecutor then stated, "In this case,—defendant did tamper. Now, he clearly also made threats. Could that be intimidating? Absolutely. But at a minimum it's tampering, which was trying to intimidate or prevent or hinder those individuals from cooperating, show up, giving evidence." RP (Mar. 21, 2014) at 408.

8

After closing arguments, the court instructed the jury to first pick a presiding juror and then "take some time to go back to the jury deliberation room and as I indicated begin the process of—but,—again, if you would like to continue your deliberations into this evening, you are free to do so." RP (Mar. 21, 2014) at 428. The court reiterated to the jury that because it was late on a Friday evening the jury could either start deliberating then or "come back and deliberate on Monday." RP (Mar. 21, 2014) at 428. The jury reported to the bailiff that after picking a foreperson they wished to retire for the weekend. The court, in setting a return time for Monday, told the jurors to report directly to the jury deliberation room and not to "start the deliberation" until "all twelve of the jurors are present." RP (Mar. 21, 2014) at 437.

On Monday, the court learned one juror was in the emergency room. The alternate juror was asked to return to the courthouse. The court summarized on the record that when the jury left on Friday, the jury had selected a presiding juror and the only issue "really decided [was] whether they were going to deliberate or leave for the weekend and . . . start[] here on Monday. . . . [The jury] made that decision to come [on Monday]." RP (Mar. 24, 2014) at 443. The court then instructed the 11 jurors, "I do not want you to discuss this case until [the alternate juror] arrives." RP (Mar. 24, 2014) at 446.

9

On that same day, the jury found Mr. Mears guilty of two counts of theft of a motor vehicle, theft of a firearm, three counts of first degree trafficking in stolen property, third degree theft, two counts of harassment by threats to kill, two counts of intimidating a witness (involving Mrs. Brown and Mr. Mullis), two counts of tampering with a witness (involving Mr. O'Bryan and Mrs. Mears), and second degree theft. The jury found Mr. Mears not guilty of one count of intimidating a witness (involving Mr. Mullis) and one count of harassment by threats to kill (involving Mr. Mullis).

On April 1, 2014, the court sentenced Mr. Mears to a high-end standard range sentence of 102 months based on an agreed upon offender score of 9, and assessed LFOs at $1,110.50 for each case number for a total obligation of $3,331.50. The court also ordered Mr. Mears to have no contact with Mrs. Mears, Mrs. Brown, Mr. Mullis, and Mr. O'Bryan until April 1, 2024 (10 years) which the court found "does not exceed the statutory maximum sentence." Clerk's Papers (CP) at 9. Mr. Mears filed three separate notices of appeal of the trial court's April 1, 2014 judgment and sentence. This court consolidated the appeals.

## ANALYSIS

1. *Sufficiency of Evidence/Jury Unanimity*

Mr. Mears first challenges the sufficiency of the evidence to support his convictions for two counts of tampering with a witness (involving Mr. O'Bryan and Mrs. Mears) and intimidating a witness (involving Mrs. Brown). He further argues the court should have provided a unanimity instruction because there are alternative means to commit these crimes.

Evidence is sufficient to support a guilty finding if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the crime's essential elements beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). An evidence sufficiency challenge "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the jury's assessment of witness credibility and evidence weight or persuasiveness. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989).

*Witness Tampering.* The witness tampering statute states in relevant part, "A person is guilty of tampering with a witness if he or she attempts to induce a witness

11

or person he or she has reason to believe is about to be called as a witness in any official proceeding . . . to (a) Testify falsely or, . . . withhold any testimony; or (b) Absent himself or herself from such proceedings; or (c) Withhold from a law enforcement agency information which he or she has relevant to a criminal investigation." RCW 9A.72.120(1).

Here, Mr. Mears came to the O'Bryan property and was asked to leave. Mr. Mears admitted during trial that he then said, "I'm going to blow your motherfucking heads off." RP (Mar. 20, 2014) at 134. This comment was directed to Mr. Mullis, but based on Mr. Mears' tone and actions, Mr. Mullis took it as applying to all individuals on the property. When the police arrived, they observed Mr. Mears left notes throughout the house, calling Mrs. Mears vile names and telling Mr. O'Bryan that he will "'know the truth; someday the truth will come out.'" RP (Mar. 21, 2014) at 199. Mr. Mears also ransacked Mrs. Mears' room and left a knife lying on her table. Later, Mr. Mears sent a letter to Mrs. Mears that ended with "'[t]ick, tock; tick, tock'" which Mrs. Mears considered to be a threat toward her. RP (Mar. 21, 2014) at 202. These actions occurred after Mr. Mears was arrested.

Viewing these facts in a light most favorable to the State, a rational trier of fact could find that both Mr. O'Bryan and Mrs. Mears were witnesses to Mr. Mears' criminal

behavior. Through threatening words and actions, Mr. Mears attempted to induce them to testify falsely, withhold testimony, absent himself or herself from such proceedings, and/or withhold from law enforcement relevant information. Thus, sufficient evidence exists to support Mr. Mears' witness tampering convictions involving both Mr. O'Bryan and Mrs. Mears.

*Intimidating a Witness.* RCW 9A.72.110(1), in relevant part, provides that an individual "is guilty of intimidating a witness if a person, by use of a threat against a current or prospective witness, attempts to: (a) Influence the testimony of that person; (b) Induce that person to elude legal process summoning him or her to testify; (c) Induce that person to absent himself or herself from such proceedings; or (d) Induce that person not to report the information relevant to a criminal investigation."

Here, there was a pretrial, no-contact order that prohibited contact with any of the State's witnesses. Mrs. Brown was a person Mr. Mears either believed might be called as a witness in any official proceeding and/or had reason to believe she had information relevant to a criminal investigation given her involvement with the stolen gun and that she resided on the O'Bryan property. After his release from jail, Mr. Mears confronted Mrs. Brown at a store and told her they were all going to jail and he was innocent, and then threatened to "'blow your f—ing heads off.'" RP (Mar. 20, 2014) at 85. Mrs. Brown

13

took the threat as a serious expression of Mr. Mears' intent. The threat was perceived as being directed at her and the other individuals involved.

Viewing this evidence in the light most favorable to the State, a rational trier of fact could find that Mr. Mears used threats to attempt to influence Mrs. Brown's testimony, induce her to elude legal process, induce her to absent herself from any future proceedings, and/or induce her to not report information relevant to a criminal investigation. Evidence is therefore sufficient to support Mr. Mears' intimidating a witness (involving Mrs. Brown) conviction.

*Unanimity Instruction.* Next, Mr. Mears argues, for the first time on appeal, the court should have provided a unanimity instruction because there are alternative means to commit witness tampering and intimidating a witness. We review de novo whether a unanimity instruction is required. *In re Det. of Keeney*, 141 Wn. App. 318, 327, 169 P.3d 852 (2007). We initially note that we reach this issue because the failure to give a unanimity instruction is an error of constitutional magnitude that a defendant may raise for the first time on appeal. *State v. Locke*, 175 Wn. App. 779, 802, 307 P.3d 771 (2013), *review denied*, 179 Wn.2d 1021 (2014).

In Washington, criminal defendants have a constitutional right to a unanimous jury verdict. CONST. art. I, § 21; *State v. Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231

14

(1994). "This right may also include the right to a unanimous jury determination as to the *means* by which the defendant committed the crime when the defendant is charged with (and the jury is instructed on) an alternative means crime." *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014) (alteration in original). An alternative means crime sets forth "*distinct acts* that amount to the same crime." *State v. Peterson*, 168 Wn.2d 763, 770, 230 P.3d 588 (2010) (alteration in original). "When a crime can be committed by alternative means, express jury unanimity as to the means is not required where each of the means is supported by substantial evidence." *State v. Gonzales*, 133 Wn. App. 236, 243, 148 P.3d 1046 (2006). However, if the evidence is insufficient to support each of the means, a particularized expression of jury unanimity is required. *Ortega-Martinez*, 124 Wn.2d at 707-08.

As discussed above, sufficient evidence exists to support all alternative means of witness tampering (involving Mr. O'Bryan and Mrs. Mears). Mr. Mears' words and actions show he attempted to induce a witness or person about to be called as a witness to testify falsely, withhold testimony, absent himself or herself from such proceedings, and withhold from law enforcement relevant information. Thus, under *Gonzales*, a unanimity instruction was not required.

Turning to the intimidating a witness convictions, Mr. Mears challenges the lack of a unanimity instruction relating to the conviction involving Mrs. Brown *and* the conviction involving her father, Mr. Mullis. As discussed above, sufficient evidence supports all means of committing intimidating a witness; therefore, a unanimity instruction was not required. Regarding Mr. Mullis, because he was with his daughter during the threats, substantial evidence exists that Mr. Mears attempted to induce, and use threats to attempt to induce, the witnesses to withhold information, not cooperate or appear, and/or not provide complete information, to prevent these cases from proceeding. Accordingly, the court did not err in not providing a unanimity instruction on either intimidation charge.

2.    *Right to Present Defense*

Mr. Mears next argues the trial court abused its discretion in excluding three of his lately disclosed witnesses.

Discovery decisions based on CrR 4.7 are within the trial court's sound discretion. *State v. Hutchinson*, 135 Wn.2d 863, 882, 959 P.2d 1061 (1998). A trial court abuses its discretion when it makes decisions based on untenable grounds or for untenable reasons. *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

16

Mr. Mears first argues the State knew he would call three of his relatives to testify on his behalf because they were listed in the police reports. This argument fails. CrR 4.7(b)(1) states, "[T]he defendant shall disclose to the prosecuting attorney . . . no later than the omnibus hearing: the names and addresses of persons whom the defendant intends to call as witnesses at the hearing or trial, together with any written or recorded statements and the *substance of any oral statements of such witness.*" (Emphasis added.) The rule clearly required Mr. Mears to inform the State of the names and addresses of the witnesses and the substance of their testimony by the omnibus hearing. Mr. Mears did not disclose even the witnesses' names until the day before trial. This was a clear violation of CrR 4.7(b)(1).

Mr. Mears next argues that the trial court's decision to exclude the three witnesses was an unjust discovery sanction and amounted to a denial of his right to present a defense. Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the criminal defendant's right to present a defense. *State v. Strizheus*, 163 Wn. App. 820, 829-30, 262 P.3d 100 (2011). But a criminal defendant does not have a constitutional right to present inadmissible evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). Here, the testimonies of the three desired witnesses were disclosed the morning of trial. The e-mail

17

disclosure shows that their proffered testimonies were entirely hearsay. Because a defendant does not have a constitutional right to present inadmissible evidence, the trial court did not abuse its discretion in disallowing testimony from these witnesses.

3.      *Prosecutorial Misconduct*

Mr. Mears next argues the prosecutor wrongly argued facts not presented during trial during his closing remarks.

A defendant claiming prosecutorial misconduct bears the burden of establishing both the impropriety of the comments and their prejudicial effect. *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994). Even where the defendant proves improper conduct, misconduct does not constitute prejudicial error unless there is a substantial likelihood it affected the jury's verdict. *State v. Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997). Where, as here, the defendant fails to object at trial, any error is waived except where the conduct is so "flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *Id.* at 719. Indeed, the absence of an objection strongly suggests that the argument did not appear critically prejudicial to the appellant in the context of trial. *State v. McKenzie*, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006) (quoting *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

18

Mr. Mears objects to the prosecutor's comments regarding threatening remarks and notes left at the O'Bryan property to support the tampering with a witness charges. Evidence presented at trial shows Mr. Mears came to the O'Bryan property and was asked to leave. Mr. Mears acknowledged during trial that he then stated, "I'm going to blow your motherfucking heads off." RP (Mar. 20, 2014) at 134. This comment could be construed as being directed to all the occupants of the property. When the police arrived, they observed Mr. Mears left notes throughout the house, calling Mrs. Mears vile names and telling Mr. O'Bryan that he will "'know the truth; someday the truth will come out.'" RP (Mar. 21, 2014) at 199. Mr. Mears also ransacked Mrs. Mears' room and left a knife lying on her table. Later, Mr. Mears sent a letter to Mrs. Mears that ended with "'[t]ick, tock; tick, tock'" which Mrs. Mears considered to be a threat toward her. RP (Mar. 21, 2014) at 202. These actions occurred after Mr. Mears was arrested.

The prosecutor's closing remarks that Mr. Mears made threatening remarks and left threatening notes was supported by the evidence. Accordingly, we perceive no impropriety in the remarks, and therefore no basis for finding prosecutorial misconduct.

4.      *Alternate Juror Instruction*

Mr. Mears argues, for the first time on appeal, he was denied his right to an impartial and unanimous jury because an alternate juror replaced an original juror without

19

special instruction from the trial court.

"Our state constitution requires that in a criminal prosecution an impartial jury render a unanimous verdict." *State v. Lamar*, 180 Wn.2d 576, 583, 327 P.3d 46 (2014) (citing CONST. art. I, §§ 21, 22). To protect this right, a trial court must instruct a jury that has begun deliberations to start anew when an original juror is replaced with an alternate juror. CrR 6.5. Failure to instruct the reconstituted jury *on the record* that it must disregard all prior deliberations and begin deliberations anew is reversible error of constitutional magnitude. *Lamar*, 180 Wn.2d at 586.

Here, the record shows there were no deliberations before the original juror was excused. The case was submitted to the jury late on a Friday afternoon. The jury conducted two administrative tasks; it picked a presiding juror and it voted to not start deliberations until Monday. Before deliberations started, the alternate juror was seated. The court clarified on the record that when the jury left on Friday, the jury had selected a presiding juror and the only issue decided was whether it was going to deliberate or leave for the weekend. The court then instructed the 11 jurors, "I do not want you to discuss this case until [the alternate juror] arrives." RP (Mar. 24, 2014) at 446. When the alternate arrived, the jury began deliberations. Accordingly, the court did not fail to comply with CrR 6.5 and there was no denial of Mr. Mears' right to an impartial and

20

unanimous jury.

5.    *Same Criminal Conduct*

Mr. Mears next contends, for the first time on appeal, that the trial court erred when it failed to treat some of his convictions as the same criminal conduct for the purpose of calculating his offender score.

Although a criminal defendant may challenge an offender score for the first time on appeal, a defendant waives that right when the alleged error involves a factual dispute or trial court discretion. *State v. Jackson*, 150 Wn. App. 877, 892, 209 P.3d 553 (2009). Where a defendant is convicted of more than one crime, the sentencing court must make discretionary decisions in determining whether those crimes arose from the same criminal conduct. *State v. Nitsch*, 100 Wn. App. 512, 523, 997 P.2d 1000 (2000). Thus, by failing to raise the issue of same criminal conduct at sentencing, a defendant waives the right to argue that issue on appeal. *Jackson*, 150 Wn. App. at 892.

During sentencing, the only mention of same criminal conduct was the prosecutor's comment, "Even if we treat certain cases as same criminal conduct we still end up with a nine or greater [offender score]." RP (Apr. 1, 2014) at 458. Defense counsel then stated that Mr. Mears agreed "with the state in terms of what the sentencing range is on the various counts." RP (Apr. 1, 2014) at 462.

21

Because Mr. Mears did not argue at sentencing that his offenses constituted the same criminal conduct, he cannot raise this issue for the first time on appeal. Nevertheless, because Mr. Mears was found guilty of 14 offenses, even if the trial court erred by not conducting a same criminal conduct analysis, his offender score would still be a 9, resulting in the same sentence. Thus, Mr. Mears cannot show prejudicial error.

6. *Sentencing Error*

Mr. Mears next challenges his sentence, arguing the no-contact provision pertaining to Mrs. Mears exceeds the statutory maximum sentence and the combination of the LFOs amounted to an improper consecutive sentence.

A defendant may challenge an illegal or erroneous sentence for the first time on appeal. *State v. Bahl*, 164 Wn.2d 739, 744, 193 P.3d 678 (2008) (quoting *State v. Ford*, 137 Wn.2d 472, 477, 973 P.2d 452 (1999)). We review such challenges de novo. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

*No-contact order.* Former RCW 9.94A.505(8) (2010)[2] states that as a part of any sentence, the court may impose and enforce crime-related prohibitions and affirmative conditions as provided in this chapter. "[T]rial courts may impose crime-related

---

[2] We note former RCW 9.94A.505(8) was renumbered as RCW 9.94A.505(9) per the Laws of 2015, ch. 287, § 10, effective July 24, 2015.

prohibitions, including no-contact orders, for a term of the maximum sentence to a crime." *Armendariz*, 160 Wn.2d at 120.

The no-contact order in this case prohibited contact with Mrs. Mears for 10 years. Mr. Mears argues that since the only conviction that involved Mrs. Mears carried a five year statutory maximum, the no-contact order could only last five years.

Witness tampering is a class C felony. RCW 9A.72.120(2). The maximum sentence for a class C felony is five years. RCW 9A.20.021(1)(c). However, no-contact orders are not limited to the victims of the crime. *State v. Warren*, 165 Wn.2d 17, 32-34, 195 P.3d 940 (2008). Division One of this court recently explained that when a witness provides testimony for multiple offenses, a no-contact order may apply up to the statutory maximum of those crimes. *State v. Navarro*, 188 Wn. App. 550, 556-57, 354 P.3d 22 (2015). Mrs. Mears was a witness to several of the crimes, including first degree trafficking in stolen property, involving the truck and log splitter. First degree trafficking in stolen property is a class B felony. RCW 9A.82.050(2). Class B felonies have a 10-year statutory maximum. RCW 9A.20.021(1)(b). Thus, because Mrs. Mears testified to an offense that carries a 10-year statutory maximum, the trial court did not err in ordering Mr. Mears to have no-contact with her for 10 years.

23

*LFOs.* Mr. Mears next argues the court violated RCW 9.94A.589(1)(a) by imposing one set of LFOs per case. Here, the court imposed a $500.00 victim assessment, $220.50 in court costs (consisting of a $200.00 criminal filing fee and a $20.50 sheriff's service fee), and $100.00 deoxyribonucleic acid collection fee. RCW 9.94A.589(1)(a) states in part, "whenever a person is to be sentenced for two or more current offenses . . . [s]entences imposed under this subsection shall be served concurrently." Mr. Mears argues this statute also applies to LFOs. But, the language of this statute and the cases cited by Mr. Mears provide no authority for requiring imposition of "concurrent" LFOs. In general, LFOs are ordered to provide restitution to the victim and reimburse the courts and attorneys for costs associated with a felony conviction. Former RCW 9.94A.030(30) (2012).[3] Each case generally involves separate expenses; thus, running LFOs concurrently would be nonsensical. Moreover, here, there were multiple victims, three separate cases filed, and three separate sheriff service fees. Accordingly, Mr. Mears' argument is unpersuasive.

Lastly, Mr. Mears argues the LFO total should have been $860.50 for each case number instead of $1,110.50. The costs do total $860.50. The higher figure appears to be

---

[3] We note that former RCW 9.94A.030(30) was renumbered as RCW 9.94A.030(31) per the Laws of 2015, ch. 287, § 1, effective July 24, 2015.

24

a clerical error. Mr. Mears may file a motion with the trial court for it to examine and correct this possible clerical error. CrR 7.8(a).

7. *Ineffective Assistance of Counsel*

Mr. Mears' final contention is that he was denied effective assistance of counsel based on counsel's failure to request a first time offender waiver, argue same criminal conduct at sentencing, object to prosecutorial misconduct, request dismissal of the witness tampering convictions based on insufficient evidence to support the convictions, and not objecting to the no-contact order and LFOs.

A criminal defendant has the right under the Sixth Amendment to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice. *Id.* If a defendant fails to satisfy either part of the test, the court need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). In order to establish the first prong, the defendant must show that his attorney's performance falls below an objective standard of reasonableness. *Stenson*, 132 Wn.2d at 705-06. There is a strong presumption of effective assistance of counsel and the defendant must establish the absence of a strategic reason for the challenged conduct. *State v. McFarland*, 127 Wn.2d 322, 335-36, 899 P.2d

25

1251 (1995). If the attorney's conduct "can be characterized as legitimate trial strategy or tactics," the conduct cannot be the basis of an ineffective assistance claim. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).

The majority of Mr. Mears' claims of deficient performance have already been addressed and no error has been found. The one remaining claim is that counsel was ineffective by failing to request a first time offender waiver during sentencing.

RCW 9.94A.650(2) allows the court to waive the imposition of a standard range sentence for a first time offender and impose a sentence including up to 90 days of confinement. If a defendant qualifies as a first time offender, the court has "broad discretion" to waive the standard range sentence and impose a first time offender sentence. *State v. Johnson*, 97 Wn. App. 679, 682, 988 P.2d 460 (1999).

If there are no disqualifying convictions, the first time offender option is available to the sentencing court without a recommendation by defense counsel. *Id.* Assuming without deciding it was deficient performance for counsel to not request a waiver, Mr. Mears' ineffective assistance of counsel claim still fails because he cannot show prejudice. It was still within the sentencing court's discretion to impose a first time offender waiver even without counsel's recommendation. The court chose not to. Moreover, the court imposed the high end of a standard range sentence, showing its intent

26

to impose a higher end sentence given the multiple crimes and victims. Without the prejudice prong, Mr. Mears' ineffective assistance of counsel argument fails. *Hendrickson*, 129 Wn.2d at 78.

 Affirm.

 A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

       _____
       Lawrence-Berrey, J.

WE CONCUR:

_____  _____
Siddoway, C.J.        Fearing, J.