# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58784-0-II |
| Respondent, | |
| v. | |
| ANTHONY L. JOHNSON, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J.—Jadey Kiser obtained a domestic violence protection order against Anthony Johnson, with whom she had one daughter. After the order was entered, Kiser received numerous phone calls and threatening text messages from an unknown number. The messages contained information that led her to believe the calls and messages were from Johnson. In addition, a friend, who also had a child with Johnson, contacted Kiser and warned her to flee her home because Johnson was threatening to kill her.

The State charged Johnson with felony harassment domestic violence, witness tampering, two counts of misdemeanor harassment, and two counts of violating a domestic violence court order. A jury convicted him of these charges.

Johnson appeals his convictions and sentence, arguing that the trial court abused its discretion by erroneously admitting ER 404(b) evidence, Washington's harassment statute is unconstitutional, the trial court erred by failing to instruct the jury on the proper mens rea for a

true threat after *Counterman v. Colorado*,[1] and insufficient evidence supported one of his misdemeanor harassment convictions. Johnson also contends that he received ineffective assistance of counsel, and cumulative error denied him a fair trial. Finally, Johnson asserts that at sentencing, the trial court erroneously refused to consider a prison-based drug offender sentencing alternative (DOSA), the trial court miscalculated his offender score for felony harassment, and his misdemeanor judgment and sentence is unclear. The State concedes the miscalculation and that the lack of clarity should be corrected on remand.

We agree that the trial court erroneously refused to consider a prison-based DOSA and miscalculated his offender score for felony harassment, and that clarification of his misdemeanor judgment and sentence is required, but we otherwise affirm his convictions. Accordingly, we remand for reconsideration of a prison-based DOSA, correction of his offender score and resentencing on that count, and clarification of his misdemeanor judgment and sentence.

## FACTS

### I. BACKGROUND

Soon after Johnson and Kiser began dating in March 2017, Kiser became pregnant with their daughter. In the beginning of their relationship, the couple lived in Portland. During their relationship, Johnson was mentally, emotionally, and physically abusive toward Kiser. Eventually, Kiser and her daughter left the home they rented with Johnson, moved to Vancouver, Washington, and obtained a protection order against Johnson. In spite of the protection order, Kiser received numerous threatening text messages and phone calls from an unknown number. Kiser believed the messages and calls were from Johnson, and Kiser reported the incidents to law enforcement.

---

[1] 600 U.S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023).

The State charged Johnson with 1 count of felony harassment including a death threat (count 1), 2 counts of violating a domestic violence court order (count 2, count 5), 2 counts of misdemeanor harassment (count 3, count 4), and witness tampering (count 6).

## II. PRETRIAL PROCEEDINGS

Prior to trial, the trial court held a hearing on the admissibility of evidence of Johnson's prior bad acts, including prior domestic violence, substance use, and prison time, under ER 404(b). In particular, the parties argued whether Kiser could testify to her recollection of an incident where Johnson threatened Kiser while holding a knife. The incident resulted in multiple Oregon criminal charges, including the unlawful use of a weapon, 2 counts of menacing—domestic violence, 4 counts of harassment, and tampering with a witness. At the ER 404(b) hearing, Johnson argued that the State had failed to prove the knife incident occurred by a preponderance of the evidence. Johnson pointed out that he was acquitted of the unlawful use of a weapon charge[2] and argued that Kiser had given two different versions of the incident. The trial court responded that Kiser's inconsistent statements would subject her to impeachment, but that was a different issue from admissibility.

The trial court then ruled that Kiser could testify to the knife incident.

I can make a finding of preponderance based on some of the things that she said.
I've already kind of gone over those. His anger, his sarcastic comments, his threats of violence, drinking, breaking toys, throwing toys, punching holes in walls. That burden has been met.
She can testify with regards to the knife incident. He can impeach her, as you choose appropriate. That goes to the element on the harassment death threats.

---

[2] The jury found Johnson not guilty of unlawful use of a weapon, harassment based on pushing Kiser into the wall, and tampering with a witness. The jury found Johnson guilty of both counts of menacing but that they did not constitute domestic violence, harassment based on pushing Kiser onto the bed, harassment based on pulling Kiser's necklace, and harassment based on spitting and throwing food.

1 Rep. of Proc. (RP) at 143-44. The trial court stated that it was admitting the evidence for the purpose of showing that Kiser was in reasonable fear of the defendant based on Johnson's words or conduct.

### III. TRIAL

The case proceeded to a jury trial. At the beginning of Kiser's testimony at trial, the trial court instructed the jury that the evidence of prior acts of violence or abusive conduct against Kiser could only be considered for the limited purpose of determining whether Kiser's fear was reasonable under the circumstances and whether Kiser could identify the sender of the text messages and the unknown caller as Johnson.

During her testimony, Kiser recalled an incident in January 2021, when Johnson spit food into Kiser's face multiple times and shoved her to their front door. Kiser tried to walk away to get to their daughter, but Johnson repeatedly shoved her into the walls of the hallway. Once Kiser made it into the bedroom with their daughter, Johnson continued to yell and spit food at Kiser. Johnson shoved her onto the bed and ripped her necklace off. Johnson then left the room before returning and shoving Kiser onto the bed again. Johnson said, "I'm going to kill you, bitch," and Kiser saw that he had a knife in his hand by his right hip. 1 RP at 326. At the end of Kiser's testimony, the trial court reminded the jury that it could consider this testimony only for the limited purpose of determining whether Kiser's fear of Johnson was reasonable and whether she could identify the sender and caller as Johnson.

As soon as Johnson left the house that night, Kiser and their daughter left the home and called 911. Kiser then moved to Vancouver, Washington and petitioned for a protection order against Johnson. The trial court admitted the temporary protection order as an exhibit. Later in trial, the trial court admitted multiple orders reissuing the temporary order as well as a final

protection order and an order denying modification or termination of the protection order. The orders were not redacted, nor did either party request redaction. The orders included boilerplate judicial findings that Johnson presented a credible threat to Kiser and that he would present a "serious and imminent threat to public health or safety, or the health or safety of any individual by possessing a firearm or other dangerous weapon." Ex. 5 at 5.

On June 15, 2021, Kiser called the police after she received multiple phone calls and text messages from someone whom she believed to be Johnson based on the content of the messages. The text messages read, "I knew u would run back to bj. I warned u not to make me look stupid," "Ima handle him as well," and "I'm going to start a video call for us," and included a hyperlink to a video call. Ex. 10. BJ was an old friend of Kiser's from high school.

While living in Vancouver, Kiser spent time with Cassandra Gill, who had two children with Johnson. Kiser called the police again on June 22, 2021, after Gill called her and told her to leave the house because Johnson was on his way there to kill her. Kiser recalled that Gill's voice was frantic as she told Kiser to pick up her daughter and leave immediately. Kiser grabbed her daughter, fled the home, and called police. Kiser testified that she felt scared after Gill told her Johnson was coming to kill her. The State admitted text messages between Kiser and Gill from that night, confirming that Gill was warning Kiser and trying to calm Johnson down.

Gill testified that she had been having a normal phone conversation with Johnson when the subject turned to Kiser possibly dating a new person. Gill recalled that Johnson went into a rage. He told Gill, "I'm going to go kill that fucking bitch right now. I'm going to her house right now. I'm going to fucking kill her." 1 RP at 460. Gill tried to calm Johnson down but he hung up. Gill described Johnson as furious and "flipping out the whole time," screaming, yelling, and cussing.

5

1 RP at 461. Johnson called Gill back and continued to threaten Kiser while Gill tried to calm him down. Johnson hung up on Gill and then called back several times.

Kiser also testified about text messages she received on July 5, 2021. Although there was no contact information related to the phone number sending the messages, Kiser testified that she knew they were from Johnson based on the content of the messages. She interpreted his statement, "U got family and life takin away over some dumb shit" as him threatening to kill her family. Ex. 13. She also explained that one message's reference to owing somebody $650 was a reference to the security deposit on their prior apartment that he believed she kept from him. Kiser explained that "'2643,'" in the text message, "'Enjoy the rest of your short-ass life. 2643 delete delete,'" referred to the passcode she used on her bank accounts, car lot, and "literally everything," which she had only ever shared with Johnson. 1 RP at 339-40. Kiser testified that she felt scared when she received the July 5 messages.

Johnson testified at trial and denied ever calling or messaging Kiser. He claimed the conversation with Gill where he threatened to kill Kiser never happened.

Prior to closing arguments and jury deliberations, the trial court instructed the jury,

> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.

Clerk's Papers (CP) at 69. The instruction did not require the jury to find that the speaker had any subjective state of mind with regard to whether the words uttered would be perceived as a threat.

As to count 1, felony harassment with death threats, the trial court instructed the jury that to find Johnson guilty it must find beyond a reasonable doubt that on or about June 22, 2021,

6

Johnson knowingly threatened to kill Kiser immediately or in the future and that Johnson's words or conduct placed Kiser in reasonable fear that the threat to kill would be carried out.

The trial court further instructed the jury,

> A person commits the crime of harassment, as charged in Count 03 and 04, when he or she, without lawful authority, knowingly threatens to cause bodily injury immediately or in the future to another person; or to cause physical damage to another person's property; or maliciously to do any act which is intended to substantially harm another person with respect to his or her physical health or safety and when he or she by words or conduct places the person threatened in reasonable fear that the threat will be carried out.

CP at 74.[3]

As to count 3, misdemeanor harassment, the to-convict instruction stated that to find Johnson guilty, the jury must find beyond a reasonable doubt that on or about June 15, 2021, Johnson knowingly threatened to cause bodily injury immediately or in the future to Kiser, and that Johnson's words or conduct placed Kiser in reasonable fear that the threat would be carried out. During closing argument, the State argued to the jury that the June 15 text, "Ima handle him as well," was the threat at the basis of count 3. Ex. 10; *see also* 1 RP at 568. The State argued that the text reasonably caused Kiser fear based on the years of tension and violence she experienced with Johnson.

As to count 4, misdemeanor harassment, the to-convict instruction stated the same but referenced a threat made on or about July 5, 2021. In closing, the State argued that the message, "Enjoy the rest of your short-ass life. 2643, delete, delete," constituted a threat. 2 RP at 575.

---

[3] Count 2 charged Johnson with violating a domestic violence court order and is not at issue here.

The trial court also instructed the jury again that it could consider Kiser's testimony about prior instances of domestic violence only for the purpose of determining the reasonableness of her fear with regard to the threats and whether Kiser could identify the sender and caller as Johnson.

The jury found Johnson guilty as charged.

## IV. SENTENCING

At sentencing, the trial court found Johnson's offender score to be 7 on both felony harassment and witness tampering with a standard sentencing range of 33-43 months. The State recommended a 38-month sentence. Johnson requested he be screened for a prison-based DOSA. The State opposed a DOSA, arguing that there was no showing of a nexus between the crimes and Johnson's substance use.

The trial court denied Johnson's request to be screened for a DOSA and imposed a mid-range standard sentence of 38 months of confinement. The trial court explained, "I don't believe this is an appropriate case to screen for DOSA. I don't think prison DOSA, crimes involving people, qualify for that." 2 RP at 661.

Johnson appeals his convictions and his sentence.

## ANALYSIS

### I. ER 404(b) EVIDENCE

Johnson argues that the trial court erred by admitting ER 404(b) evidence to prove his identity and, specifically, by admitting evidence of the knife incident without first finding by a preponderance of the evidence that the incident occurred. We disagree.

We review the trial court's decision to admit or exclude evidence of misconduct under ER 404(b) for an abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). A trial court's error in admitting evidence is reviewed under the standard for nonconstitutional error.

8

*State v. Gunderson*, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014). A nonconstitutional error is harmless where there is no reasonable probability that the error materially affected the verdict. *Id*.

Under ER 404(b), evidence of prior misconduct is categorically barred when it is offered "for the purpose of proving the character of a person in order to show that the person acted in conformity with that character." *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). The same evidence, however, may be admitted for proper purposes that include but are not limited to "'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Id.* (quoting ER 404(b)). "ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged." *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)).

Before admitting evidence of prior misconduct, a trial court must, on the record, "'(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" *Gresham*, 173 Wn.2d at 421 (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

A.     Preponderance Finding

Johnson also argues that the trial court erred by admitting testimony of the knife incident without first finding by a preponderance of the evidence that the incident actually occurred. Essentially, Johnson and the State disagree as to how the trial court's oral ruling should be interpreted and whether the trial court's language shows that it made the required finding. Johnson

contends that the trial court's finding of a preponderance was limited to other bad acts—"'[h]is anger, his sarcastic comments, his threats of violence, drinking, breaking toys, throwing toys, punching holes in walls'"—but did not include the knife incident. Br. of Appellant at 64 (quoting 1 RP 143-44). We disagree.

The record reflects that the trial court understood the requisite analysis in order to admit the ER 404(b) evidence. The trial court specifically identified the factors it must consider in making its ruling and walked through each on the record. The court discussed with the parties the admissibility of the knife incident, in particular, and the fact that Johnson had been acquitted of the charge involving the knife. It is unreasonable to interpret the record to mean that the trial court properly conducted an ER 404(b) analysis as to some bad acts but not the one most at issue. The more reasonable interpretation of the record, and the one we adopt here, is that the trial court noted "[h]is anger, his sarcastic comments, his threats of violence, drinking, breaking toys, throwing toys, punching holes in walls" as being part of the basis for its preponderance finding. 1 RP at 143-44. Although the trial court's finding that the knife incident also occurred may not be as explicit, when the entire discussion is read in context, it is apparent the trial court properly found that the knife incident was supported by a preponderance of the evidence in accordance with ER 404(b).

## B.  Improper Identity Evidence

Here, the trial court admitted evidence of Johnson's prior bad acts for the purpose of showing the reasonableness of Kiser's fear. But the limiting instruction issued to the jury stated that the evidence could also be considered to determine whether Kiser could identify the sender of the text messages and the unknown caller as Johnson. Johnson argues, and the State concedes, that admitting the evidence to show Johnson's identity was improper. A prior act is not admissible to show identity merely because it is similar, but only if it bears such a high degree of similarity as

to mark it as the handiwork of the accused. *Foxhoven*, 161 Wn.2d at 176. We agree with the parties that Johnson's prior bad acts here did not rise to this level of similarity, and we accept the State's concession.

Because the trial court improperly instructed the jury that evidence of Johnson's prior bad acts could be considered to prove Johnson's identity, we must address whether the court's error was harmless. *State v. Ashley*, 186 Wn.2d 32, 47, 375 P.3d 673 (2016). "Erroneous admission of evidence in violation of ER 404(b) is harmless unless there is a reasonable probability that the verdict would have been materially different but for the error." *Id*. Here, there is no reasonable probability that the admission of Johnson's prior bad acts for consideration of his identity caused the verdict to be materially different.

The evidence was admitted for the proper purpose of showing Kiser's reasonable fear and therefore the evidence was already in the minds of the jurors. *Id*. at 48. Johnson argues that despite the evidence's otherwise proper admission, the error in instructing the jury that it could consider the same evidence for identity is not harmless because Johnson specifically disputed whether he was the person who sent the text messages and made the phone calls. We disagree.

Johnson testified at trial that he never sent the messages or called Kiser. But the jury did not find him credible. Moreover, the evidence that Johnson sent the messages and made the calls was based on Kiser's testimony regarding the content of the messages, not on Johnson's prior bad acts. Kiser testified that she knew the text messages were from Johnson based on the content of the messages themselves, which included details that only Johnson would know such as the amount of their previous security deposit and her passcode. Given that the evidence was otherwise properly before the jury and the State's theory on identification did not hinge on Johnson's prior bad acts, we hold that the trial court's error was harmless.

11

## II. CONSTITUTIONALITY OF HARASSMENT STATUTE

In his supplemental appellate brief, Johnson argues that all of his harassment convictions must be reversed because Washington's harassment statute, RCW 9A.46.020, is unconstitutional. We disagree.

Under RCW 9A.46.020(1)(a)(i)[4], a person is guilty of harassment if they knowingly threaten to cause bodily injury. Harassment involving a death threat is a class C felony. RCW 9A.46.020(2)(b); *State v. Johal*, 33 Wn. App. 2d 408, 413, 561 P.3d 1235 (2025). The knowledge element requires the defendant to know they were conveying a threat and to know that the communication was a threat to harm or kill the threatened person or another person. *State v. Calloway*, 31 Wn. App. 2d 405, 417, 550 P.3d 77 (2024), *review granted*, No. 103374-5 (Wash. Dec. 4, 2024). Following the United States Supreme Court's recent decision in *Counterman*, the First Amendment also requires a showing the defendant acted at least recklessly by "consciously disregard[ing] a substantial risk that [the] communications would be viewed as threatening violence." 600 U.S. at 69.

In *Calloway*, we held that there was "no direct conflict between the statutory language and the *Counterman* articulation of what amounts to a true threat." 31 Wn. App. 2d at 420. And instead of declaring the harassment statute unconstitutional, "[w]e need only hold . . . that the State must prove the defendant was at least "'aware that others could regard [the] statements as threatening violence and deliver[ed] them anyway.'" *Id.* (second and third alteration in original) (internal quotation marks omitted) (quoting *Counterman*, 600 U.S. at 79). Therefore, consistent with *Calloway*, we hold that RCW 9A.46.020 is not unconstitutional.

---

[4] We cite the current version of RCW 9A.46.020 as the relevant language has not changed.

III. IMPROPER JURY INSTRUCTIONS

Johnson argues that his harassment convictions must be reversed because the harassment jury instructions failed to define a true threat as required under *Counterman*. The State responds that Johnson failed to preserve this issue for appeal and, if we reach the merits, that the jury instructions were erroneous but the error was harmless beyond a reasonable doubt. We hold that Johnson may raise this issue for the first time on appeal, but the error was harmless beyond a reasonable doubt.

A.     Preservation of Error

Generally, we will not consider issues raised for the first time on appeal. *State v. Frieday*, 33 Wn. App. 2d 719, 743, 565 P.3d 139 (2025). Under RAP 2.5(a), we may refuse to review any claim of error that was not raised in the trial court. This principle helps avoid unnecessary appeals by ensuring that the trial court has the opportunity to correct any errors. *Frieday*, 33 Wn. App. 2d at 743.

Here, Johnson did not object to the jury instructions at his September 2023 trial, despite the fact that *Counterman* had been decided in June 2023, two months earlier. The State argues, as an initial matter, that when a defendant raises a new argument for the first time on appeal, they must generally address RAP 2.5(a) in their briefing. *Id.* at 744. Otherwise, we consider the issue waived. *Id.*; *see also State v. Lindsey*, 177 Wn. App. 233, 247, 311 P.3d 61 (2013) (declining to address issue raised for the first time on appeal where defendant failed to address any of the RAP 2.5(a)(3) exceptions); *State v. Knight*, 176 Wn. App. 936, 951, 309 P.3d 776 (2013) (declining to address double jeopardy jury instruction challenge where defendant failed to make any showing that the alleged error was manifest).

Johnson contends that the trial court's failure to instruct the jury on the correct mens rea for a true threat is manifest constitutional error reviewable for the first time on appeal. The State responds that Johnson's contention does not amount to sufficient argument as to why the issue is reviewable for the first time under RAP 2.5(a). While Johnson certainly could have made more robust argument, his argument was adequate. In his opening brief, to support his contention that the jury instruction error is reviewable for the first time on appeal, Johnson cited *Sate v. Schaler*, 169 Wn.2d 274, 287, 236 P.3d 858 (2010). There, the Supreme Court held that the failure to give a "true threat" jury instruction was manifest constitutional error warranting review for the first time on appeal. *Id*. This reference to controlling law on the reviewability of the same issue amounts to sufficient argument regarding reviewability under RAP 2.5(a). Accordingly, we turn to whether Johnson shows a manifest constitutional error in this case.

RAP 2.5(a)(3) permits appellate review of manifest errors affecting a constitutional right raised for the first time on appeal. The parties agree that omission of a mens rea element of a crime from the jury instructions is a constitutional error. Thus, our inquiry focuses on whether the constitutional error was manifest.

"'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)). Actual prejudice requires a plausible showing that the asserted error had practical and identifiable consequences in the case. *Id.*

As the Washington Supreme Court explained in *Schaler*, the RAP 2.5 manifest error analysis "is distinct from deciding whether the error was harmless and therefore does not warrant reversal." 169 Wn.2d at 284. There, the court determined the failure to instruct the jury on the First Amendment's "true threat" requirement was manifest constitutional error warranting review for

the first time on appeal. *Id.* at 288. The *Schaler* court explained that the failure to properly instruct the jury allowed the jury to convict Schaler based on his utterance of protected speech. The *Schaler* court noted that given the clear state of the law at the time that it instructed the jury, the trial court could have corrected the error and thus the constitutional error was manifest. *Id.*

Given the similarities between this case and *Schaler*, we follow the "manifest" analysis articulated in *Schaler*. Like in *Schaler*, here the trial court issued erroneous jury instructions that allowed the jury to convict Johnson without finding that he acted recklessly, as *Counterman* requires. Similarly to *Schaler*, the trial court could have corrected the instructional error given that *Counterman* was decided two months prior to Johnson's trial. We therefore hold that the error was manifest and thus we must address it on appeal.

B.     Constitutional Harmless Error

There is no dispute that the trial court's instruction regarding what constitutes a true threat failed to comply with *Counterman.* But "[e]ven manifest constitutional errors may be harmless." *Schaler*, 169 Wn.2d at 283. The "omission of the constitutionally required mens rea from the jury instructions . . . is analogous to" the omission of an element of the crime from the instructions. *Id*. at 288. Such an omission is thus subject to constitutional harmless error review. *Id*. Prejudice is presumed, and the State must prove that the error was harmless beyond a reasonable doubt. *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013).

An omission of the required mens rea from the jury instructions "may be harmless when it is clear that the omission did not contribute to the verdict," for example, when "uncontroverted evidence" supports the omitted element. *Schaler*, 169 Wn.2d at 288. Conversely, an "error is not harmless when the evidence and instructions leave it ambiguous as to whether the jury could have convicted on improper grounds." *Id*.

15

1.      Count 1

Johnson's conviction for felony harassment, as charged in count 1, was based on the statements Johnson made during his phone call with Gill wherein he repeatedly threatened to kill Kiser. He told Gill, "I'm going to go kill that fucking bitch right now. I'm going to her house right now. I'm going to fucking kill her," while he was "flipping out the whole time," screaming, yelling, and cussing. 1 RP at 460-61. Gill repeatedly tried to calm Johnson down but he continued to make threats against Kiser. We hold that the instructional error on this count was harmless beyond a reasonable doubt.

Gill testified Johnson repeatedly told Gill that he was going to kill Kiser. Johnson's remarks were unequivocal; they were made during a rage after learning Kiser may have been dating someone else. Importantly, Johnson knew Gill regarded his statements as threatening violence and delivered them anyway—Gill testified that she continually tried to calm Johnson down while Johnson raged and threatened to kill Kiser. Johnson's only response to this evidence was to say that the conversation with Gill never happened, which the jury did not find credible.

Johnson argues that "[t]he second-hand nature" of the threat makes it more likely that it was uttered as hyperbole or an expression of frustration to a confidant. Br. of Appellant at 33. We disagree. In *State v. J.M.*, 144 Wn.2d 472, 488, 28 P.3d 720 (2001), the Supreme Court held that the perpetrator need not know or intend that the threat will be communicated to the victim. And the person to whom the defendant communicates the threat may be someone other than the person threatened. *Id.*

It would be unreasonable to conclude that Johnson may have thought Gill took his threats as hyperbolic or in jest given the fact that Gill repeatedly tried to calm Johnson down. Johnson was aware that Gill was alarmed by Johnson's statements given her efforts to calm him and

nonetheless continued to repeat his threats to kill Kiser. Put another way, the evidence is clear that Johnson was aware that Gill regarded his statements as threatening violence and delivered them anyway. Moreover, although there are statements in our record indicating that Johnson may have had a drinking problem, there was no testimony suggesting he was obviously intoxicated or that Johnson did not know what he was saying.

Given the unequivocal nature of the statements and the circumstances under which he made them, no reasonable jury would find that Johnson did not at least consciously disregard a substantial risk that his communications would be viewed as threatening violence.

We hold that the jury instruction error is harmless beyond a reasonable doubt as to count 1.

2.      Count 3

A person is guilty of misdemeanor harassment if, without "lawful authority," they knowingly threaten to "cause bodily injury immediately or in the future to the person threatened or to any other person," and they place "the person threatened in reasonable fear that the threat will be carried out." RCW 9A.46.020(1)(a)(i), (b). Here, the jury was instructed that to convict Johnson as charged in count 3, it had to find that on or about June 15, 2021, Johnson knowingly threatened to cause bodily injury immediately or in the future to Kiser.

a. Harmless error

Johnson's conviction for count 3 was based on June 15 text messages including, "I warned u not to make me look stupid," and "Ima handle him as well." Ex. 10. Johnson argues that the messages were nothing more than a "vague, nonspecific statement," but we disagree. Br. of Appellant at 35.

The content of the message is clear—Johnson warned Kiser not to go back to BJ, she disobeyed him, and now she and BJ would suffer the consequences of Johnson "handling" them. Nothing in the record suggests that the texts were sent in jest or as hyperbole, or that Johnson had any sort of incapacity that implicated his state of mind when he sent the messages. Johnson's only defense was that he did not send the texts, which the jury found not credible.

Given these circumstances, no reasonable jury would find that Johnson did not at least consciously disregard a substantial risk that his communications would be viewed as threatening violence. Accordingly, we hold that the trial court's jury instruction error was harmless beyond a reasonable doubt as to count 3.

### b. Sufficient evidence

Johnson also argues that the State provided insufficient evidence to prove that this language threatened Kiser at all. A defendant who contests the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences drawn from that evidence. *State v. Trey M.*, 186 Wn.2d 884, 905, 383 P.3d 474 (2016). Circumstantial evidence and direct evidence are equally reliable. *State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016).

When reviewing a claim of insufficient evidence, we do not "reweigh the evidence and substitute our judgment for that of the jury." *State v. McCreven*, 170 Wn. App. 444, 477, 284 P.3d 793 (2012). Rather, because the jury "observed the witnesses testify firsthand, we defer to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness and the appropriate weight to be given the evidence." *Id.*

In his appellate brief, Johnson argues that the State failed to prove that he threatened to cause Kiser bodily injury, as opposed to BJ. The State emphasizes that the text message threatened to handle BJ "'*as well*,'" arguing that it meant Johnson was threatening harm against both BJ and

Kiser. Br. of Resp't at 25. At oral argument, Johnson appeared to concede that there is a reasonable inference that "as well" meant any threat was also against Kiser. Wash. Ct. of Appeals oral arg., *State v. Johnson*, No. 58784-0-II (June 23, 2025), at 32 min., 9 sec., *audio recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-2-court-of-appeals-2025061025/?eventID=2025061025.

Johnson also argues that insufficient evidence supported a finding that the messages constituted a true threat of bodily injury. The messages clearly referenced a warning not to make Johnson look stupid, and then threatened the consequence of Johnson "handling" Kiser and BJ. While "handling" may not be an explicit threat of bodily injury, threatening language need not be literal to amount to a true threat. *State v. Locke*, 175 Wn. App. 779, 790, 307 P.3d 771 (2013). Rather we review the facts and circumstances surrounding the statements. *Id*. Given Johnson's history with Kiser and his reference to having "warned" her, taking the evidence in the light most favorable to the State, a reasonable juror could infer that the message constituted a true threat. Ex. 10.

Johnson also argues that insufficient evidence supported a finding that Kiser was placed in reasonable fear. Kiser testified that she found the messages threatening. And her fear is evidenced by the fact that she contacted law enforcement after receiving them. Moreover, the jury heard testimony that these threats were made after Kiser experienced violence while living with Johnson, and she and her daughter escaped. Given the context under which the messages were received—despite an active domestic violence no contact order prohibiting Johnson from contacting Kiser due to his violent actions—a reasonable juror could have found that Kiser was placed in reasonable fear that Johnson would carry out his true threat to cause her bodily injury.

Accordingly, we hold that sufficient evidence supported Johnson's conviction in count 3.

3.      Count 4

Johnson's conviction for misdemeanor harassment, as charged in count 4, was based on the July 5 text messages sent to Kiser stating, "Enjoy the rest of your short-ass life. 2643, delete, delete." 2 RP at 575-76.

This message threatened Kiser by suggesting that her life would be shortened. The fact that the message was intended to be threatening is underscored by the inclusion of Kiser's confidential information. Kiser testified that "2643" was her passcode for "literally everything" in her life and only Johnson knew it. 1 RP at 340. In context, the message is meant to inform Kiser that her life would be shortened. The emphasis on her passcode—information that only Johnson knew— showed not only that Johnson sent the messages, but also that Johnson had the information to help him gain access to her private information, suggesting his access could facilitate the accomplishment of his threat.

It would be unreasonable to conclude that Johnson was not aware that Kiser would take the message as threatening. Johnson made these statements after he knew Kiser had involved law enforcement over his previous threats. Nothing in the record suggests that these statements were anything other than an intentional threat of violence against Kiser. Johnson did not offer an alternative explanation for the texts—he denied ever sending them, which the jury clearly found not credible.

Given these circumstances, no reasonable jury would find that Johnson did not at least consciously disregard a substantial risk that his communications would be viewed as threatening violence. Accordingly, we hold that the trial court's jury instruction error was harmless beyond a reasonable doubt as to count 4.

IV. Ineffective Assistance of Counsel

Johnson argues that his trial counsel performed deficiently by failing to seek redactions in the no-contact orders admitted as exhibits. The orders included unredacted judicial findings that Johnson presented a credible threat to Kiser and that he would present a "serious and imminent threat to public health or safety, or the health or safety of any individual by possessing a firearm or other dangerous weapon." Ex. 5 at 5. The State concedes that this failure constituted deficient performance but argues that Johnson cannot show that the deficient performance resulted in prejudice. We agree with the State.

The right to counsel includes the right to effective assistance of counsel. *State v. Crawford*, 159 Wn.2d 86, 97, 147 P.3d 1288 (2006). To show ineffective assistance of counsel, a defendant must show that defense counsel's conduct was deficient and that the deficient performance resulted in prejudice. *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Defense counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). Prejudice ensues if the result of the proceeding would have been different had defense counsel not performed deficiently. *Id*.

As the State acknowledges, the failure to redact the judicial findings on the protection order exhibits should not have occurred. Counsel should have ensured redaction of the no-contact orders before their admission as exhibits. Moreover, we acknowledge that the findings would have conveyed to the jury that a judicial officer thought Johnson was a danger to Kiser, and that if he were allowed to possess firearms, he would present imminent danger to the public as well. But as previously discussed, the evidence of Johnson's guilt is overwhelming from the text messages themselves, and to the extent he contends he did not send the text messages, the circumstantial

21

evidence that he sent the texts was significant. Gill's testimony that he made threats to Kiser was also compelling, and the contemporaneous texts between the women provide confirmation that Gill understood Johnson's statements to be threatening. Moreover, the judicial findings in boilerplate, pre-printed language would likely not have added much to what the jury already knew given that Kiser had protection orders against Johnson. We cannot conclude that but for the erroneous admission of judicial findings in the exhibits, the outcome of the proceedings would have been different. Accordingly, Johnson's ineffective assistance of counsel claim fails.

## V. CUMULATIVE ERROR

Johnson argues that cumulative error deprived him of a fair trial. We disagree.

Under the cumulative error doctrine, the court may reverse a defendant's conviction when the combined effect of trial errors effectively denies the defendant their right to a fair trial, even if each error alone would be harmless. *State v. Lazcano*, 188 Wn. App. 338, 370, 354 P.3d 233 (2015). The defendant bears the burden to show multiple trial errors and that the accumulated prejudice from those errors affected the outcome of their trial. *Id*.

The trial court erred by giving an incorrect instruction as to the definition of true threat, the protection order exhibits should have been redacted to hide the trial court's findings as to the danger that Johnson presented, and the trial court should not have allowed the jury to consider Johnson's prior instances of domestic violence for purposes of identity. But as previously discussed, the evidence of Johnson's guilt on his convictions is overwhelming. The threats to kill Kiser that Johnson made in the phone call to Gill were both unequivocal and continued after it was clear that Gill was taking them seriously. Gill's testimony was corroborated by contemporaneous texts and Kiser's similar account of what Gill told her that day. The threats Johnson made by text that were the basis for counts 3 and 4 were also unequivocal, and one contained details only he

would know, contradicting his assertion that he was not the one who made the threats. In the face of this evidence, Johnson fails to show that the accumulated prejudice of multiple trial errors affected the outcome of his trial.

## VI. Sentencing Issues

Johnson also makes several arguments regarding sentencing and contends that resentencing on both his felony and misdemeanor sentences is appropriate.

### A. Eligibility For Prison-Based DOSA

Johnson argues that the trial court abused its discretion by refusing to consider a prison-based DOSA, asserting the court erroneously believed that Johnson was ineligible. We agree.

Under RCW 9.94A.505(2)(a)(i), a trial court is ordinarily expected to impose a standard range sentence, but under certain circumstances "the court may deviate from the standard range." *State v. Yancey*, 193 Wn.2d 26, 30, 434 P.3d 518 (2019). A DOSA is one alternative to standard range sentencing that "give[s] eligible nonviolent drug offenders a reduced sentence, treatment, and increased supervision in an attempt to help them recover from their addictions." *State v. Grayson*, 154 Wn.2d 333, 337, 111 P.3d 1183 (2005); *see* RCW 9.94A.660. Under RCW 9.94A.660(3), a DOSA may be prison-based or residential.

Defendants are not entitled to receive DOSAs, but they may "ask the trial court to consider such a sentence and to have the alternative actually considered." *Grayson*, 154 Wn.2d at 342. If a person is eligible for a DOSA, the trial court decides if the DOSA is appropriate. *State v. Hender*, 180 Wn. App. 895, 900, 324 P.3d 780 (2014). If a judge denies a DOSA and imposes a standard range sentence, that decision is usually unreviewable. *State v. Bramme*, 115 Wn. App. 844, 850, 64 P.3d 60 (2003). But a defendant may appeal a DOSA denial "if the trial court refused to exercise

discretion at all or relied on an impermissible basis in making the decision." *State v. Lemke*, 7 Wn. App. 2d 23, 27, 434 P.3d 551 (2018).

In deciding whether to grant a DOSA, the trial court may properly consider the defendant's criminal history, whether the defendant would benefit from substance abuse treatment, and whether the DOSA would serve both the defendant and the community. *State v. Jones*, 171 Wn. App. 52, 55-56, 286 P.3d 83 (2012). A trial court may "consider the type or circumstances of the crime" at issue. *State v. Van N*oy, 3 Wn. App. 2d 494, 499, 416 P.3d 751 (2018).

Johnson contends that the trial court erroneously refused to consider a prison-based DOSA based on its mistaken belief that he was ineligible because his convictions involved crimes against people. The State responds that the trial court did not mistakenly believe Johnson was ineligible, but rather determined that a DOSA was not appropriate given the facts and circumstances of the case. The State emphasizes that the trial court did not use the word "ineligible," but rather that it did not believe it was "'an appropriate case to screen for DOSA.'" Br. of Resp't at 62 (quoting 2 RP at 661). But this ignores the trial court's next sentence: "I don't think prison DOSA, crimes against people, qualify for that." 2 RP at 661. Because the trial court erroneously stated that Johnson did not qualify, relying in part on an improper basis for declining to impose a prison-based DOSA, we must remand for the trial court to consider a prison-based DOSA sentence.

B.      Offender Score

Johnson also argues that resentencing is required because the trial court erroneously calculated his offender score for felony harassment. The State concedes that the offender score was incorrect but argues that the error does not require the trial court to consider a residential DOSA. We agree with the State.

The trial court's calculation of Johnson's offender score for felony harassment erroneously counted his witness tampering offense as two points. RCW 9.94A.525(21)(a-b) specifies which felony domestic violence convictions count as two points for offender score calculation; witness tampering is not one of them. Accordingly, Johnson's offender score for felony harassment should have been 6 and not 7. On remand, the trial court should impose a new sentence for felony harassment within the new standard range.

Johnson argues that because of the lower offender score and corresponding lower standard sentence range, he would now be eligible for a residential DOSA. The State agrees that Johnson's offender score for felony harassment should be a 6 requiring remand for correction of the judgment and sentence, but the State argues that full reconsideration of a residential DOSA is unnecessary because the offender score for witness tampering remains the same and becomes the controlling sentencing term.

Johnson appears to agree in his reply that the higher sentencing range for witness tampering makes Johnson ineligible for a residential DOSA and argues instead that Johnson might be eligible for an exceptional sentence downward. But Johnson did not argue for an exceptional sentence below. On remand, the offender score for the felony harassment conviction should be corrected, and if necessary, Johnson should be sentenced to a term within the standard range for the correct offender score.

C.      Clarity of Judgment and Sentence

Johnson also argues that his misdemeanor judgment and sentence is unclear as to whether the trial court ordered 364 days in jail or 12 months of supervised probation. The State concedes, and we accept the State's concession. The sentence for Johnson's misdemeanors should be clarified on remand.

No. 58784-0-II

CONCLUSION

In sum, we hold that the trial court did not abuse its discretion by admitting ER 404(b) evidence to show Kiser's reasonable fear, and the trial court's error in admitting that evidence to show identity was harmless. Washington's harassment statute is not unconstitutional. We further hold that the trial court erred by improperly instructing the jury as to the requisite mens rea for harassment but that this error was harmless. There was sufficient evidence to support the conviction on count 3. Johnson's defense counsel performed deficiently by not seeking redaction of judicial findings in exhibits at trial, but Johnson fails to show the deficient performance prejudiced him. Cumulative error did not deprive Johnson of a fair trial.

Accordingly, we affirm Johnson's convictions and remand for reconsideration of a prison-based DOSA, correction of his offender score for the felony harassment conviction, and clarification of the judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

GLASGOW, J.

PRICE, J.

26